# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CHRISTIE COFFIN; KIMBERLY
WILLMOTT and BRENDA KASATY

      Plaintiffs,

vs.                                                                                           No. CIV 20-0144 JB/GJF

MAGELLAN HRSC, INC.,

      Defendant.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Plaintiffs' Motion to Transfer Venue, filed July 8, 2020 (Doc. 48). The Court held a hearing on August 7, 2020. See Clerk's Minutes at 1, filed August 7, 2020 (Doc. 60). The primary issues are: (i) whether the Court should depart from the law of the case and retransfer the action to the United States District Court for the Southern District of California; (ii) whether unanticipated post-transfer change in circumstances exist in this case and if the Court should consider them to warrant departure from the law of the case regarding transfer; and (iii) whether the Court may exercise personal jurisdiction over the class-action Plaintiffs' claims after Christie Coffin, Kimberly Willmott, and Brenda Kasaty (the "Class Representatives") withdrew from a similar class-action case currently pending in the United Stated District Court for the District of New Mexico. The Court concludes that the case should not be retransferred to the Southern District of California because: (i) there are no factors that warrant the

---

[1]On March 18, 2021, the Court entered an Order denying Plaintiffs' Motion to Transfer Venue, filed July 8, 2020 (Doc. 48). See Order at 1-2, filed March 18, 2021 (Doc. 64). In the Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for the decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

reconsideration of the original transfer order and thus departure from the law of the case; (ii) the Court should not consider unanticipated post-transfer changes in circumstance in considering a motion to retransfer, and, even if it does, such changes have not occurred in this case; and (iii) the Court may exercise personal jurisdiction over the Plaintiffs' claims because the Class Representatives' withdrawal from an ongoing case in the District of New Mexico, <u>Deakin v. Magellan Health, Inc. et al.</u>, No. 17-cv-773 KWR/KK, does not revoke their consent to the District of New Mexico's jurisdiction. The Court, therefore, will deny the request to retransfer venue to the Southern District of California.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiffs' Class Action Complaint. <u>See</u> Plaintiffs' Class Action Complaint for Violations of California Labor Law Statutes and Unfair Business Practices, filed June 14, 2019 (Doc. 1-3)("Complaint"). The Court accepts the factual allegations as true for the purposes of the Motion. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>Sanders v. Mountain Am. Fed. Credit Union</u>, 689 F.3d 1138, 1141 (10th Cir. 2012)(concluding that a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor"). The Court does not, however, accept as true the legal conclusions within the Complaint. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Christie Coffin, Kimberly Willmott, and Brenda Kasaty, all worked at various points in time from 2014 through the present as Care Managers and Senior Care Managers for the Defendant, Magellan HRSC, Inc. ("Magellan HRSC"). <u>See</u> Complaint ¶¶ 20, 26, 32, at 8-10. Of the Class Representatives, only one resides currently in California. <u>See</u> Declaration of Abbey M. Jahnke in

Support of Plaintiffs' Motion to Transfer Venue, filed July 8, 2020, 3 (Doc. 50)("Jahnke Decl."). The Plaintiffs proposed a class that includes the Class Representatives and "all similarly situated former and current employees of Magellan HRSC who, at any time during the four year period preceding the filing of this complaint, were employed in California in the capacity of a 'care manager' or 'senior care manager' and classified as an exempt employee." Complaint ¶ 37, at 10.

Magellan HRSC classified the Plaintiffs as employees exempt from overtime pay, leading the Class Representatives to file causes of action, including: (i) failure to pay wages under Cal. Lab. Code §§ 201, 202, 204; (ii) failure to pay overtime compensation under Cal. Indus. Welfare Comm'n, Order No. 4-2001; (iii) failure to furnish accurate itemized wage statements under Cal. Lab. Code § 226(a); and (iv) unlawful business practices under Cal. Bus. & Prof. Code § 17200. See Complaint ¶¶ 47-86, at 12-19. Magellan HRSC classified employees working in the roles of "Care Manager" and "Senior Care Manager" as exempt from the requirement to be paid overtime wages, because:

> [S]uch employees' duties and responsibilities: (1) did not involve the management of Magellan's business and/or the on-site location at which they were employed; (2) did not customarily and regularly involve directing the work of two or more employees; (3) did not include the authority to hire or fire other employees; (4) did not include the authority to customarily and regularly exercise discretion and independent judgment; (5) such employees were not engaged in work that was primarily intellectual, managerial or creative; and (6) such employees were not primarily engaged in the duties which are required in order to qualify as an exempt employee under California Industrial Welfare Commission Wage Order No. 4-2001, or any other California Industrial Commission Wage Order.[2]

---

[2]The applicable overtime compensation requirement states: "This order shall apply to all persons employed in professional, technical, clerical, mechanical, and similar occupations whether paid on a time, piece rate, commission, or other basis, except that: A -- Provisions of sections 3 through 11 shall not apply to persons employed in an administrative, executive, or professional capacity." Complaint ¶ 61, at 14 (quoting Cal. Indus. Welfare Comm'n, Order No. 4-2001 (Jan. 1, 2001)).

Complaint ¶ 11, at 7.

During their employment with Magellan HRSC, the Plaintiffs were expected to, and did consistently, "work in excess of 8 hours in a day and/or 40 hours in a work week without being paid overtime compensation." Complaint ¶ 44, at 11. During their employment, the Plaintiffs were not paid for the full amount of time worked, compensated for overtime worked, nor provided itemized wage statements. See Complaint ¶¶ 21, 27, 33, 39, at 8-10.

## PROCEDURAL BACKGROUND

In June, 2019, the Plaintiffs filed a class action in the Superior Court of California for the County of San Diego against Magellan HRSC. See Order Granting Defendant's Motion to Transfer Venue, filed February 19, 2020 (Doc. 23-1)(Bashant, J.)("SDC Order"). The Plaintiffs allege that Magellan HRSC misclassified certain employees as exempt from overtime pay and raises claims for: (i) failure to pay wages; (ii) failure to pay overtime compensation; (iii) failure to furnish accurate itemized wage statements; and (iv) unlawful business practices. See SDC Order at 2, 7. Magellan HRSC removed the case to the United States District Court for the Southern District of California and then sought to transfer the action to the United States District Court for the District of New Mexico. See SDC Order at 2, 3.

On February 19, 2020, the Honorable Cynthia Bashant, United States District Judge for the Southern District of California, transferred this action to the District of New Mexico. See SDC Order at 1. The SDC Order states that the first-to-file rule applies to this action regarding an ongoing case in the District of New Mexico, Deakin v. Magellan Health, Inc. et al., No. 17-cv-773 KWR/KK ("Deakin"), pending before the Honorable Kea W. Riggs, United States District Judge for the District of New Mexico. See SDC Order at 8-9; Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Transfer Venue, filed July 8, 2020, 3 (Doc. 49)("Transfer

Memo"). Judge Bashant notes that <u>Deakin</u> was filed before this action. <u>See</u> SDC Order at 3.

Judge Bashant also concludes that both actions contain substantially similar parties, including the

same Defendant and two classes that "will encompass at least some of the same individuals." SDC

Order at 5. Judge Bashant explains that the underlying allegations of the two actions are the same:

that Magellan HRSC misclassifies certain employees as exempt from overtime pay and underpays

employees because of this misclassification. <u>See</u> SDC Order at 8. Judge Bashant concludes that:

(i) the Plaintiffs did not show that they will suffer prejudice because of a transfer of venue; (ii) that

dismissal is inappropriate because this action includes claims founded on the California Labor

Code, rather than just the FLSA and New Mexico law in <u>Deakin</u>; and (iii) that transfer to the

District Court of New Mexico is most appropriate. <u>See</u> SDC Order at 9-10.

**1.** **The Plaintiffs' Motion to Transfer Venue.**[3]

On July 8, 2020, the Plaintiffs filed a Motion to Transfer Venue to the United States District

Court for the Southern District of California. <u>See</u> Plaintiffs' Notice of Motion and Motion to

Transfer Venue at 1, filed July 8, 2020 (Doc. 48)("Motion"). The Plaintiffs argue that transfer is

proper, because this action: (i) was filed originally in California and may be heard in the Southern

District of California; (ii) alleges violations of substantive California law; and (iii) arises out of

events and transactions taking place exclusively in California. <u>See</u> Motion at 2. The Plaintiffs

argue that these considerations, along with discretionary factors and the interests of an efficient

judiciary, make the Southern District of California proper venue for this action. <u>See</u> Motion at 2.

The Plaintiffs note that this action was previously pending, with no jurisdictional or venue

---

[3]The Motion does not mention the law of the case, changes in circumstance that warrant reconsideration of venue, or personal jurisdiction challenges that all arise in the Plaintiffs' later reply to Magellan's response. <u>See</u> Plaintiffs' Reply in Support of Motion to Transfer Venue at 1, 5-7, filed August 3, 2020 (Doc. 58).

defect, in the Southern District of California and thus "might have been brought" in the Southern District of California, in accordance with 28 U.S.C. § 1404. See Transfer Memo at 4. The Plaintiffs then contend that the discretionary factors a court may consider in making a transfer decision weigh in favor of transferring the action, including: (i) the Southern District of California is the Plaintiffs' original choice of forum; (ii) a significant number of witnesses and sources of proof for the Plaintiffs' action are located in California and Magellan HRSC has no ties to New Mexico regarding these claims; (iii) the cost of making the necessary proof will be less in California given that a majority of witnesses reside there; (iv) that California law governs the Plaintiffs' claims and thus that there is a possibility of existence of questions arising in the area of conflict of laws; and (v) that having a local California court decide questions of California law is advantageous. See Transfer Memo at 4-10. The Plaintiffs note that the other discretionary factors are neutral, including: (i) questions about the enforceability of a judgment should one be obtained in the District of New Mexico; (ii) a fair trial is achievable in either the District of New Mexico or the Southern District of California; and (iii) difficulties that may arise from congested dockets. See Transfer Memo at 7-8. The Plaintiffs therefore request that the Court grant their Motion to Transfer Venue under 28 U.S.C. § 1404(a). See Transfer Memo at 4, 11.

**2.      The Response.**

Magellan HRSC responds to the Motion. See Defendant's Opposition to Plaintiffs' Motion to Transfer Venue, filed July 22, 2020 (Doc. 56)("Response"). Magellan HRSC argues that the action was transferred properly to the District of New Mexico under the first-to-file rule, because this action is tied to a Fair Labor Standards Act, 29 U.S.C. § 203 ("FLSA") class action pending currently before Judge Riggs in Deakin that the Plaintiffs "had ***affirmatively*** opted-in to." Response at 2 (emphasis in original). Magellan HRSC maintains that the Court must apply the

law-of-the-case principle that "generally forbids one district court from reconsidering issues that another district court decided in the same case." Response at 2 (quoting <u>Ulferts v. Franklin Res., Inc.</u>, Nos. 07-848, 07-1309, 2007 WL 2021787 at *2 (D.N.J. June 9, 2007)(Martini, J.)). Magellan HRSC then contends that law-of-the-case principles apply, particularly to transfer decisions, and prohibit the Court from reconsidering previous decisions in the case that the United States District Court for the Southern District of California made. <u>See</u> Response at 2.

Magellan HRSC argues that reconsideration of a transfer decision may be appropriate if "'governing law has been changed by a subsequent decision of a higher court, when new evidence becomes available, when a clear error has been committed, to prevent manifest injustice, . . . or if circumstances change as to warrant retransfer.'" Response at 2 (quoting <u>Koehring Co. v. Hyde Constr. Co.</u>, 382 U.S. 362, 365 (1966), and citing <u>Chrysler Credit Corp. v. Country Chrysler, Inc.</u>, 928 F.2d 1509, 1516 (10th Cir. 1991)("<u>Chrysler Credit Corp.</u>")). Magellan HRSC argues that changes in circumstance that warrant retransfer must be "unanticipatable post-transfer events" which frustrate the transfer's original purpose. Response at 2 (quoting <u>School-Link Technologies, Inc., v. Applied Resources, Inc.</u>, No. 05-cv-2485-JWL, 2006 WL 1064111, at *3 (D. Kan. April 20, 2006)(Lungstrum, J.)("<u>School-Link</u>")(citing <u>In re Cragar Indus., Inc.</u>, 706 F.2d 503, 505 (5th Cir. 1983)).

Magellan HRSC, discussing <u>Chrysler Credit Corp.</u>, argues that no "governing law has been changed by a subsequent decision of a higher court." Response at 3. Magellan HRSC also observes that no new evidence is available that warrants retransferring the case to the Southern District of California. <u>See</u> Response at 3. Magellan HRSC asserts that Judge Bashant did not make a clear error in transferring the case to the District of New Mexico, because the Class Representatives "affirmatively opted-in" to <u>Deakin</u>, and Judge Bashant therefore "decided that it

was in the best interests of judicial efficiency for the case to transfer to the District of New Mexico where" <u>Deakin</u> "is pending." Response at 4. Noting the Plaintiffs' admission that "'a fair trial may be achieved in either venue,"' Magellan HRSC argues that there is "no manifest injustice created if this case stays pending in the District of New Mexico." Response at 4 (quoting Motion at 7).

Magellan HRSC then argues that the Class Representatives' subsequent opting-out of <u>Deakin</u>, on June 25, 2020, is not an unanticipated, post-transfer change of circumstance that warrants reconsidering the previous transfer decision. <u>See</u> Response at 1. Magellan HRSC maintains that, given that the option to withdraw from <u>Deakin</u> existed before the transfer of venue in September, 2019, the Plaintiffs could have anticipated their withdrawal. <u>See</u> Response at 4. Magellan HRSC contends that the option to withdraw from <u>Deakin</u>, was "at all times . . . available" to the Plaintiffs. Response at 4. Magellan HRSC submits, therefore, that the Plaintiffs' subsequent decision to withdraw from <u>Deakin</u> represents a tactical attempt to forum shop. <u>See</u> Response at 4-5.

### 3. **The Reply**.

The Plaintiffs reply that law-of-the-case principles do not apply here, because their withdrawal from <u>Deakin</u> makes the first-to-file rule inapplicable. <u>See</u> Plaintiffs' Reply in Support of Motion to Transfer Venue at 1, filed August 3, 2020 (Doc. 58)("Reply"). The Plaintiffs insist that their withdrawal from <u>Deakin</u> constitutes "a post-transfer change of circumstance that warrants reconsider[ing] venue in the first instance." Reply at 2. The Plaintiffs further argue that the Court should adopt a broad interpretation of post-transfer changes in circumstance that warrant reconsidering previous transfer decisions. <u>See</u> Reply at 2-3. The Plaintiffs argue that, in <u>School-Link</u>, a post-transfer dismissal of the first-filed claim constituted a proper change in circumstance

for the District of Kansas to reconsider venue.  See Reply at 3-4.  The Plaintiffs also contend that, similar to the possibility of withdrawing from Deakin before the original transfer order, the motion to dismiss the first-filed claim was pending when the United States District Court for the Central District of California made the decision to transfer the case to the District of Kansas in School-Link.  See Reply at 4.  The Plaintiffs maintain that, as in School-Link, their withdrawal from Deakin "undercut the original purpose of the transfer."  Reply at 4.

The Plaintiffs then contend that Magellan HRSC misapplies the requirement of a change in circumstances being "'unanticipated.'"  Reply at 4 (quoting In re Cragar Indus. Inc., 706 F.2d 503, 505-06 (5th Cir. 1983)("Cragar")).    The Plaintiffs argue that the requirement of an unanticipated change in circumstance applies only when the party who made the initial transfer request makes a second transfer request.  See Reply at 4-5.  The Plaintiffs therefore contend that this requirement does not apply in this action, because Magellan HRSC made the original request to transfer the case -- a request the Plaintiffs "vehemently opposed."  Reply at 5.

Next, the Plaintiffs argue that the Court lacks personal jurisdiction over them.  See Reply at 5.  The Plaintiffs argue that, following their withdrawal from Deakin on June 25, 2020, they have insufficient minimum contacts with the State of New Mexico to allow the Court to exercise personal jurisdiction.  See Reply at 5 (citing International Shoe v. Washington, 326 U.S. 310 (1945)).  The Plaintiffs contend that they did not consent to the Court's exercise of personal jurisdiction because: (i) they did not bring this action in New Mexico; (ii) they opposed transfer of this action to New Mexico; (iii) they have not appeared in this action in New Mexico; and (iv) they have not purposefully availed themselves of New Mexico's laws nor jurisdiction.  See Reply at 5.

Last, the Plaintiffs argue that the Court should transfer this action back to the Southern

District of California, because they filed the original action, consisting of California state-law claims, in California State court.  See Reply at 6.  The Plaintiffs then argue that most of the discretionary factors that the United States Court of Appeals for the Tenth Circuit considers in motions to transfer favor transferring the case, including: (i) the location of witnesses and evidence relevant to this action; and (ii) that the applicable substantive law is California State law.  See Reply at 6-7.  The Plaintiffs conclude that the interests of justice favor transfer to the Southern District of California, because the decisions in Deakin no longer bind the Plaintiffs and there is no risk of duplicative litigation or inconsistent rulings.  See Reply at 7.

     **4.**     **The Hearing.**

     The Court held a hearing on August 7, 2020.  See Clerk's Minutes at 1, filed August 7, 2020 (Doc. 60).  At the hearing, the Plaintiffs argued that the action is best heard in the Southern District of California.  See Draft Transcript of Hearing at 2:24-31 (taken August 7, 2020)(Ostroff)("Tr.").[4]  The Plaintiffs, referring to the law-of-the-case principle, stated that this no longer applied and that the action's reliance on California law, witnesses, and evidence creates "no basis at this point to favor retaining the case before this court."  Tr. at 3:9-10 (Ostroff).

     Next, the Court inquired about the Plaintiffs' argument that the Court lacks personal jurisdiction over the Plaintiffs after their withdrawal from Deakin.  See Tr. at 3:11-15 (Court).  The Plaintiffs explained that Deakin is an ongoing class action suit in the District of New Mexico that alleges violations of New Mexico and federal wage and hour laws.  See Tr. at 4:5-8 (Ostroff).  Before the Plaintiffs' withdrawal, there had been approximately forty-five members of this action involved in Deakin.  See Tr. at 4:9-13 (Ostroff).  Conditional class certification has occurred in

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Deakin, but the Plaintiffs contend that notice had not gone out to class members before their withdrawal. See Tr. at 4:14-17 (Ostroff). The Plaintiffs then argued that consolidation of Deakin and this action would cause only delay and complication, because this action relies purely on California law while Deakin rests on federal and New Mexico law. See Tr. at 4:23-25 (Ostroff).

The Plaintiffs explained that this action was filed originally as a cumulative class action in California State court. See Tr. at 5:21-24 (Ostroff). After removal, the Plaintiffs observed, the Southern District of California transferred the case to the District of New Mexico to be joined with Deakin, a case that involves similar issues and the same defendant as this action. See Tr. at 6:1-7 (Ostroff). The parties agreed that the chief issue in both Deakin and this action is whether class members in both actions are properly classified as exempt from overtime pay. See Tr. at 6:14-16 (Ostroff); id. at 10:12-14 (Shadi). The Plaintiffs argued that this shared issue does not outweigh the difference in the law to be applied between the two actions. See Tr. at 8:20-23 (Ostroff). Magellan HRSC responded that the shared issue between Deakin and this action warrants transfer and "the matters that" the Plaintiffs are "raising in terms of other types of claims are largely going to forms of damages that may need calculated and additional entitlements" under California law. Tr. at 10:14-22 (Shadi).

Next, Magellan HRSC presented its opposition to the Motion. See Tr. at 9:14 (Shadi). Magellan HRSC stressed that School-Link establishes that any change in circumstance that warrants reconsidering transfer decisions must be unanticipatable. See Tr. at 11:14-16 (Shadi). Magellan HRSC argued that the Plaintiffs' decision to withdraw voluntarily from Deakin is a tactical decision completely within the Plaintiffs' control and thus anticipatable. See Tr. at 11:18-24 (Shadi). Magellan HRSC asserted that the Plaintiffs availed themselves voluntarily of the Court's personal jurisdiction by choosing to join Deakin and that their choice to withdraw from

that action is not a revocation of consent to the Court's exercise of personal jurisdiction. See Tr. at 11:23-25 (Shadi); id. at 12:14-20 (Shadi). The Plaintiffs responded, arguing that their initial consent to join the class action, and thus submit to the Court's personal jurisdiction, does not preclude their withdrawal of consent at a later time that then would allow a new action to be brought in any proper venue. See Tr. at 14:1-6 (Ostroff).

The Court then concluded the hearing. See Tr. at 14:7 (Court). The Court, noting that it is "hesitant, after a federal judge in California looked at this issue and transferred it here, to start bouncing it back," stated that the Plaintiffs initial decision to join Deakin amounted to consent to the exercise of jurisdiction by the Court. Tr. at 14:11-17. The Court concluded that it is "inclined to keep" the case. Tr. at 14:16-17 (Court).

5.      **The Order.**

On March 18, 2021, the Court issued an order denying the Plaintiffs' Motion to Transfer Venue. See Order Denying Plaintiffs' Motion to Transfer Venue at 2, filed March 18, 2021 (Doc. 64)("Order"). The Court agreed with Judge Bashant that the "'first-to-file rule applies because litigation involving substantially similar parties and issues is pending in an earlier-filed case in New Mexico, and transfer of this action to that district will maximize judicial efficiency and consistency." Order at 1-2 (quoting SDC Order at 11). The Court concluded that the previous transfer created a "'heavy presumption' in favor of keeping the case in the United States District Court for the District of New Mexico," and should not be reconsidered lightly. Order at 2. The Court stated that it would not serve the interests of judicial efficiency to reconsider the original transfer order. See Order at 2. The Court, regarding the Plaintiffs' personal jurisdiction challenge, observed that "once 'a party joins a case, they consent to total jurisdiction of the court where that case is.'" Order at 2 (quoting Tr. at 14:15-17 (Court)). The Court concluded that: "(i) it has the

power to adjudicate the case; (ii) it has jurisdiction over the case; (iii) it has personal jurisdiction over the Plaintiffs; and (iv) that keeping the case will be good judicial practice."  Order at 2 (quoting Tr. at 14:21-15:1 (Court)).  In the Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for the decision."  Order at 1 n.1.

## LAW REGARDING THE ERIE DOCTRINE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64, (1938)(Brandeis, J.)("Erie"), a federal district court sitting in diversity jurisdiction applies "state law with the objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord. Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a State Supreme Court "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the [State] Supreme Court . . . would [rule]."  Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).[5]  "Just

_____

[5]In performing its Erie-mandated duty to predict what a State supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456, 466 (1967), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the State supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with State court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old State supreme court precedent usually binds State trial courts.  The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the State supreme court, especially if mostly

- 13 -

as a court engaging in statutory interpretation must always begin with the statute's text, a court

formulating an Erie prediction should look first to the words of the State supreme court." Peña v.

Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.). If the Court finds only an

opinion from the State Court of Appeals, while "certainly [the Court] may and will consider the

Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of

Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley

v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only

opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court

sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case

were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state")).[6] Ultimately, "the Court's task is

---

dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent
illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d 1103, 1132
n.17 (D.N.M. 2015)(Browning, J.). In short, a State supreme court case that a federal court predicts
under Erie that the State court would overrule is likely to be very old, neglected in subsequent
State court cases -- perhaps because it is in a dusty corner of the common law which does not get
much attention or have much application -- and clearly wrong.

[6]The Supreme Court of the United States has addressed what the federal courts may use
when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the
> duty of the federal courts, where the state law supplies the rule of decision, to
> ascertain and apply that law even though it has not been expounded by the highest
> court of the State. An intermediate state court in declaring and applying the state
> law is acting as an organ of the State and its determination, in the absence of more
> convincing evidence of what the state law is, should be followed by a federal court
> in deciding a state question. We have declared that principle in West v. American
> Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day. It is true that
> in that case an intermediate appellate court of the State had determined the

to predict what the state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord. Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins., 483 F.3d at 665-66). See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig., 288 F. Supp. 3d 1087, 1161-67 (D.N.M. 2017)(Browning, J.).

---

immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts,] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed.1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

## LAW REGARDING PERSONAL JURISDICTION

The court's jurisdiction may rest on general or specific personal jurisdiction. Due process, however, limits any state statutory basis for personal jurisdiction. "[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists." Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995).

> When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of facts that would support the assertion of jurisdiction. Wenz v. Memery Crystal, 55 F.3d at 1505. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavit." Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733. When, however, a defendant presents credible evidence through affidavits or other materials suggesting the lack of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a genuine dispute of material fact on the issue. See Doe v. Nat'l Med. Servs., 974 F.2d 143, 145 (10th Cir. 1992). Only if the plaintiff meets the obligation of contesting the credible evidence that the defendant presents does the court resolve the factual disputes in favor of the plaintiff. See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733.

Clark v. Meijer, Inc., 376 F.Supp.2d 1077, 1082 (D.N.M. 2004)(Browning, J.). When, however, "personal jurisdiction is assessed in an evidentiary hearing . . . , the plaintiff generally must establish, by a preponderance of the evidence, that personal jurisdiction exists." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 n.4 (10th Cir. 2008).

"Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law of the forum state." Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1166 (10th Cir. 2011). "The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: first, that the exercise of jurisdiction is sanctioned by the state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment" to the Constitution of the United States of America. Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1166 (10th Cir. 2011). New Mexico's

long-arm "statute extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible." Tercero v. Roman Catholic Diocese of Norwich, Conn., 2002-NMSC-018, ¶ 6, 132 N.M. 312 (2002). Consequently, the Court "need not conduct a statutory analysis apart from the due process analysis." Marcus Food Co. v. DiPanfilo, 671 F.3d at 1166 (internal quotation marks omitted).

### 1. General and Specific Jurisdiction.

Depending on the character and extent of a defendant's contacts, a court may exercise general or specific personal jurisdiction. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a quid pro quo: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078. Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir. 2011).

A court may assert specific jurisdiction "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)(citations omitted)(internal quotation marks omitted). In the tort context, a defendant has "purposefully directed" his activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. Dudnikov v. Chalk

& Vermilion Fine Arts, Inc., 514 F.3d 1063, 1069-70 (10th Cir. 2008)(citing Calder v. Jones, 465 U.S. 783, 789-90 (1984)).

Cases involving the internet modify these general personal jurisdiction principles. In these cases, the United States Court of Appeals for the Tenth Circuit focuses on whether the website or internet user "intentionally direct[ed] his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." Shrader v. Biddinger, 633 F.3d 1235, 1240 (10th Cir. 2011)(emphasis in original). Simply posting defamatory statements on a website will not, standing alone, establish personal jurisdiction over the poster in any state where the post may be read. See Shrader v. Biddinger, 633 F.3d at 1241. Instead, courts consider whether the "defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." Shrader v. Biddinger, 633 F.3d at 1241. In short, "the forum state itself must be the focal point of the tort." Shrader v. Biddinger, 633 F.3d at 1244 (emphasis in original)(quoting Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1074 n.9)(internal quotation marks omitted).

The Court has decided cases dealing with general and specific jurisdiction. In Fabara v. GoFit, LLC, a plaintiff injured by an allegedly defective exercise ball in New Mexico brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma. See 308 F.R.D. 380, 408 (D.N.M. 2015), as amended (Aug. 20, 2015)(Browning, J.). The manufacturer moved to dismiss the complaint under rule 12(b)(2), arguing that the plaintiff lacked general jurisdiction because its contacts with New Mexico were neither continuous nor systematic. See 308 F.R.D. at 384. The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them. See 308 F.R.D. at 389.

The Court rejected this theory, explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here." 308 F.R.D. at 397. The Court noted that the manufacturer had almost no physical connections with New Mexico, and that its internet sales of roughly $20,000.00 over nine years were insufficiently "substantial" to support general jurisdiction. 308 F.R.D. at 402.

In Diener v. Trapeze Asset Management, Inc., No. CIV 15-0566 JBLAM, 2015 WL 8332933 (D.N.M. Nov. 30, 2015)(Browning, J.), the Court considered whether it had specific jurisdiction over a Canadian asset management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico. See 2015 WL 8332933, at *1. The Court concluded that it did not have specific jurisdiction for four primary reasons. See 2015 WL 8332933, at *13. First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site." 2015 WL 8332933, at *15. Second, the third-party listing was similarly passive. See 2015 WL 8332933, at *15. Third, the Court noted that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," noting that the alleged torts occurred in Canada. 2015 WL 8332933, at *17 (quoting Benton v. Cameco Corp., 375 F.3d 1070, 1077 (10th Cir. 2004)). Fourth, the plaintiffs reached out to the defendants to create the contractual relationship, distinguishing the case from cases finding purposeful availment. See 2015 WL 8332933, at *17 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 473).

**2.      Due Process and Personal Jurisdiction.**

The due process analysis is also two-fold: First, [the defendant] must have "minimum contacts" with the forum state, demonstrating that he "purposefully

availed" himself of the protections or benefits of the state's laws and "should reasonably anticipate being hailed into court there." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473-76 (1985); <u>see also</u> <u>Emp'rs Mut. Cas. Co.</u>, 618 F.3d at 1159–60 (reiterating the Burger King standard). Although agreements alone are likely to be insufficient to establish minimum contacts, "'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" <u>TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.</u>, 488 F.3d 1282, 1287–88 (10th Cir. 2007)(quoting <u>Burger King</u>, 471 U.S. at 473, 478).

<u>Marcus Food Co. v. DiPanfilo</u>, 671 F.3d at 1166.

A defendant may reasonably anticipate being subject to suit in the forum state "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985)(internal citation omitted); <u>see also</u> <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State.").

<u>TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.</u>, 488 F.3d at 1287-88. The Supreme Court of

the United States has held that the mere foreseeability of harm occurring in a particular forum will

not support a finding of minimum contacts. <u>See</u> <u>World–Wide Volkswagen Corp. v. Woodson</u>, 444

U.S. 286, 295 (1980)(holding that, although "an automobile is mobile by its very design and

purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a

forum state, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction

under the Due Process Clause"). In <u>Roberts v. Piper Aircraft Corp.</u>, 1983-NMCA-110, 100 N.M.

363, the Court of Appeals of New Mexico similarly rejected the argument that foreseeability could

establish minimum contacts, and found no personal jurisdiction or minimum contacts in the

following circumstances:

[T]he record is devoid of any contact between Scenic Aviation and New Mexico. Scenic Aviation is a fixed-base operator selling aviation fuel in Las Vegas, Nevada. There is no evidence that Scenic Aviation advertises in New Mexico, or sells fuel to New Mexico residents. Without "contacts, ties, or relations" with New

> Mexico the fact that fuel sold by Scenic Aviation found its way into our state does not support a valid exercise of personal jurisdiction.

1983-NMCA-110, ¶ 19, 100 N.M. at 367. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being hailed into court there." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297. As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook intentional actions that were expressly aimed at that forum state." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1077.

Similarly, to find general jurisdiction over a defendant, contacts must be "continuous and systematic"; therefore, "[s]imply because a defendant has a contractual relationship and business dealings with a person or entity in the forum state does not subject him to general jurisdiction there"; "correspondence with a forum resident does not support general jurisdiction;" and "sporadic or isolated visits to the forum state will not subject the defendant to general jurisdiction," because a "[defendant's] lack of a regular place of business in [the forum state] is significant, and is not overcome by a few visits." Shrader v. Biddinger, 633 F.3d at 1247. "[G]eneral jurisdiction over a web site that has no intrinsic connection with a forum state requires commercial activity carried on with forum residents in such a sustained manner that it is tantamount to actual physical presence within the state." Shrader v. Biddinger, 633 F.3d at 1246. When analyzing minimum contacts sufficient for general jurisdiction in regard to the operation of a web site, the Tenth Circuit has referred to, without adopting, a "sliding scale" framework. Shrader v. Biddinger, 633 F.3d at 1242 n.5.

At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

633 F.3d at 1242 n.5 (internal quotation marks omitted).

If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him "does not off' end 'traditional notions of fair play and substantial justice.'" See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1080 (10th Cir. 2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:

(1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.

Id. (brackets omitted); see also OMI Holdings, Inc. [v. Royal Ins. Co. of Canada], 149 F.3d at 1095 (10th Cir. 1998)(applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 671 F.3d at 1167.

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M. 2009)(Browning, J.), the Court

considered whether it had personal jurisdiction over defendants who allegedly slandered, defamed,

and caused the plaintiff -- Michael Silver -- duress, by posting a blog on the internet that portrayed him in a negative light.  See 678 F. Supp. 2d at 1204.  The Court determined that it did not have personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that McMullen "was significantly associated with the blog or controlled it in any way."  678 F. Supp. 2d at 1212.  The Court also concluded that it did not have personal jurisdiction over the blog post's author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to New Mexico, and did not transact business there.  See 678 F. Supp. 2d at 1211.  The Court said that Brown's blog posts similarly did not establish personal jurisdiction, because

> the blog is closer to an informative website than a commercial website. No services are offered, and Brown is not collecting revenue from the website.  Brown does not interact with the people who post information on the blog.  Brown, to the Court's knowledge, did not solicit negative postings on the website.  Further, even though people in New Mexico can view the website, the blog is not a website that is directed solely at the people of New Mexico.  The number of people who can access the website in New Mexico in comparison to those who are able to access the website throughout the world, or even in the United States, according to the statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211–12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its decision as to Brown.  See Silver v. Brown, 382 Fed. App'x at 727-32.  In an opinion that the Honorable Monrow G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Broby and Ebel joined, the Tenth Circuit applied the three-part test from Calder v. Jones to conclude that the Court had personal jurisdiction over Brown.  See Silver v. Brown, 382 Fed. App'x at 727-32.

Judge McKay first explained that the posting of the blog was "clearly an intentional act" designed to damage the plaintiff's reputation.  382 Fed. App'x at 729.  Second, Judge McKay said that Brown had "expressly aimed his blog at New Mexico[,]" where Silver, his business, and the

majority of his customers were located. 382 Fed. App'x at 729. Judge McKay said: "It was about a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and [his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico." 382 Fed. App'x at 729-30. Third, Judge McKay explained that Brown knew Silver would suffer the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business activities." 382 Fed. App'x at 730.

### 3.    Class-Action Plaintiffs and Personal Jurisdiction.

The Supreme Court has long held that the purpose of ensuring a State has personal jurisdiction is "to protect a defendant from the travail of defending in a distant forum, unless the defendant's contacts with the forum make it just to force him to defend there." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 807 (1985). Accordingly, the primary emphasis of a personal jurisdiction inquiry is to ensure that the States do not place undue burden upon out-of-state defendants, nor "reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980). Regarding the exercise of personal jurisdiction over class-action plaintiffs, the Supreme Court in Phillips Petroleum Co. v. Shutts held:

> The Fourteenth Amendment does protect "persons," not "defendants," however, so absent plaintiffs as well as absent defendants are entitled to some protection from the jurisdiction of a forum State which seeks to adjudicate their claims. In this case we hold that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant. . . . We reject petitioner's contention that the Due Process Clause of the Fourteenth Amendment requires that absent plaintiffs affirmatively "opt in" We think that such a contention is supported by little, if any precedent, and that it ignores the differences between class-action plaintiffs, on the one hand, and defendants in nonclass civil suits on the other. Any plaintiff may consent to jurisdiction.

472 U.S. at 811-12 (Rehnquist, J.)(citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770

(1984))(no citation for quotation).

The exercise of personal jurisdiction over defendants in class actions rests on the more recent Supreme Court precedent of <u>Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.</u>, 137 S. Ct. 1773 (2017)(Alito, J.)("<u>Bristol-Myers Squibb</u>"). In <u>Bristol-Myers Squibb</u>, a class of over 600 individuals brought California State law claims against a drug manufacturer in California State court. <u>See</u> 137 S. Ct. at 1778. Of those, only eighty-six class members had purchased the drug manufacturer's pills and suffered harm from their use in California. <u>See</u> <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1778. The defendant drug manufacturer challenged the California court's exercise of specific personal jurisdiction over the non-resident plaintiffs' claims.[7] The Supreme Court agreed, concluding that "a defendant's general connections with the forum are not enough. As we have said, '[a] corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1781 (quoting <u>Goodyear Dunlop Tires Operations v. Brown</u>, 564 U.S. 915, 927 (2011)(Ginsburg, J.)).

The Supreme Court held:

> [T]here must be an "affiliation between the forum and the underlying

---

[7]The Plaintiffs were also unable to establish general personal jurisdiction, as the Supreme Court held:

> "For an individual, the paradigm forum for the exercise of general personal jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at-home." <u>Goodyear Dunlop Tires Operations v. Brown</u>, 564 U.S. 915, 924 (2011). A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State. <u>Goodyear Dunlop Tires Operations v. Brown</u>, 564 U.S. at 919.

<u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1780 (emphasis in original). Bristol-Myers Squibb was domiciled in New York and Delaware, and thus, not amenable to the court's exercise of general jurisdiction in California. <u>See</u> <u>Bristol-Myers Squibb</u>, 137 S. Ct. at 1777.

> controversy, principally, [an] activity or occurrence that takes place in the forum State." Goodyear, 564 U.S. at 919. When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State. See id., at 931.

Bristol-Myers Squibb, 137 S. Ct. at 1781 (alteration in original). The Supreme Court notes that this decision implicates the due-process limits on State courts, and that it "leave[s] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." Bristol-Myers Squibb, 137 S. Ct. at 1784. Most recently, the Supreme Court has refined its rule in Bristol-Myers Squibb that there must be an "affiliation between the forum and the underlying controversy," 137 S. Ct. at 1781, noting that "[n]one of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do [in establishing specific personal jurisdiction]. . . . The rule demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.'" Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1027 (2021)(Kagan, J.)("Ford Motor Co.")(emphasis in original).

A party to an action may also consent to a court's exercise of personal jurisdiction. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 n.14 (1985)(quoting Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982)("Ins. Corp. of Ireland")). The Supreme Court in Insurance Corporation of Ireland states: "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived. . . . A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court." 456 U.S. at 703. Such implied consent may be found in a case where a plaintiff files an action that: (i) rests on a similar issue and similar facts as a case currently pending in another district; and (ii) creates a high likelihood of transfer to the district hearing the first-filed action to increase judicial efficiency. See Scott Dodson, Plaintiff

Personal Jurisdiction and Venue Transfer, 117 Mich. L. Rev. 1463, 1481 (2019).

4.       **New Mexico's Long Arm Statute**.

New Mexico's long-arm statute provides, in relevant part, that its courts may exercise

personal jurisdiction over a party "whether or not a citizen or resident of this state … as to any

cause of action arising from: (1) the transaction of business within this state … [or] (3) the

commission of a tortious act within this state . . . ." N.M.S.A. § 38-1-16.  For New Mexico courts

> to exercise personal jurisdiction over nonresident, out-of-state defendants,
> the following three-part test must be satisfied: (1) the defendant's act must be one
> of the five enumerated in the long-arm statute; (2) the plaintiff's cause of action
> must arise from the act; and (3) minimum contacts sufficient to satisfy due process
> must be established by the defendant's act.  State Farm Mut. Ins. Co. v. Conyers,
> 109 N.M. 243, 244 (1989)(citing Salas v. Homestake Enterprises, Inc., 106 N.M.
> 344, 345 (1987)).  The first and third step of this test have been "repeatedly equated"
> with the due process standard of "minimum contacts."

F.D.K. v. Hiatt, 1994-NMSC-044, ¶ 7, 117 N.M. 461, 463.  "When negligent acts occur outside

New Mexico which cause injury within the state, a 'tortious act' has been committed for purposes

of the long-arm statute."  Tercero v. Roman Catholic Diocese of Norwich, Conn., 2002-NMSC-

018, ¶ 20, 132 N.M. 312, 319.  "As with the transaction of business analysis, rather than engage

in a technical analysis of whether the defendant committed a tortious act, we must equate the

'tortious act' which the defendant is alleged to have committed with minimum contacts to

determine if due process has been satisfied."  Tercero v. Roman Catholic Diocese of Norwich,

Conn., 2002-NMSC-018, ¶ 20, 132 N.M. at 319 (alteration omitted)(internal quotation marks

omitted).

### LAW REGARDING LAW-OF-THE-CASE DOCTRINE

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case.'"  Poche v.

Joubran, 389 F. App'x 768, 774 (10th Cir. 2010)(quoting Dobbs v. Anthem, 600 F.3d 1275, 1279

(10th Cir. 2010)).  The Tenth Circuit recognizes the doctrine "serves 'important' functions. 'Without something like it, an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again.'" <u>Fish v. Schwab</u>, 957 F.3d 1105, 1139 (10th Cir. 2020)(quoting <u>Entek GRB, LLC v. Stull Ranches, LLC</u>, 840 F.3d 1239, 1240 (10th Cir. 2016)).  The doctrine applies "both to rulings by district courts, <u>see</u>, <u>e.g.</u>, <u>Clark v. State Farm Mut. Auto. Ins. Co.</u>, 590 F.3d 1134, 1140 (10th Cir. 2009), and . . . by previous panels in prior appeals in the same litigation, <u>see</u>, <u>e.g.</u>, <u>United States v. Wardell</u>, 591 F.3d 1279, 1300 (10th Cir. 2009)." <u>Bishop v. Smith</u>, 760 F.3d 1070, 1082 (10th Cir. 2014).  The Tenth Circuit also has "acknowledged, however, that 'the rule [of law-of-the-case] is a flexible one that allows courts to depart from an erroneous prior ruling, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d 1217, 1225 (10th Cir. 2007)(citing <u>Prairie Band Potawatomi Nation v. Wagnon</u>, 476 F.3d 818, 823 (10th Cir. 2007)).  The doctrine is inapplicable where "a ruling remains subject to reconsideration." <u>Wallace v. United States</u>, 372 F. App'x 826, 828 (10th Cir. 2010)(quoting <u>In re Unioil, Inc.</u>, 962 F.2d 988, 993 (10th Cir. 1992)).  This means that "district courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1255 (citing <u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 55 (1st Cir. 2005); <u>United States v. Smith</u>, 389 F.3d 944, 949 (9th Cir. 2004)(explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case)).  Although "discretionary rather than mandatory," <u>Sinfuego v. Curry Cnty. Board of Comm'rs</u>, No. CIV 15-0563 JB\GF, 2018 WL 6047438, *14 (D.N.M. 2018)(Browning, J.)(quoting <u>Homans v. City of Albuquerque</u>, 366 F.3d 900, 904 (10th Cir. 2004)), the Tenth Circuit has noted that, "it takes 'exceptionally narrow circumstances' for the court not to follow the law of the case when the doctrine applies." <u>Bishop</u>

v. Smith, 760 F.3d 1070, 1082 (10th Cir. 2014)(quoting United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)).

"Policies supporting the [law-of-the-case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988). The Tenth Circuit has held that application of "[t]raditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court, including its transfer order." Chrysler Credit Corp., 928 F.2d at 1516. The Supreme Court has cautioned against courts engaging in a "perpetual game of jurisdictional ping-pong," resolving the issue by holding that "courts will rarely transfer cases over which they have clear jurisdiction, and close questions, by definition, never have clearly correct answers. Under law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 819 (1988)(citing Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981)). The Tenth Circuit has maintained that transferee courts are allowed flexibility in reevaluating decisions made by transferor courts "when the governing law has been changed by the subsequent decision of a higher court, when new evidence becomes available, when a clear error has been committed or to prevent manifest injustice." Chrysler Credit Corp., 928 F.2d at 1516 (citations omitted).

"Under [the Tenth Circuit]'s law of the case doctrine, '[a] legal decision made at one stage of litigation unchallenged in a subsequent appeal when the opportunity to do so existed, [generally] becomes the law of the case.'" Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1242 (10th Cir. 2016)(Gorsuch, J.)(quoting Concrete Works of Colo., Inc. v. Cty. Of Denver, 321 F.3d 950, 992 (10th Cir. 2003)). Regarding transfer decisions, then,

> [t]he date the papers in the transferred case are docketed in the transferee court also forms the effective date that appellate jurisdiction in the transferor circuit is

terminated; the transfer order becomes unreviewable as of that date. Because an appeal from a transfer order filed after the physical transfer of the record would be futile, the preferred approach is to delay physical transfer of the papers in the transferred case for a long enough time to allow the aggrieved party to file a mandamus petition.

Chrysler Credit Corp., 928 F.2d at 1517.

In Chrysler Credit Corp., claims were brought against a local Chrysler dealer in the Western District of Oklahoma, who subsequently filed a number of counterclaims and third-party complaints. 928 F.2d at 1513. The Western District of Oklahoma concluded that the claims from the various parties could be appropriately bifurcated under Fed. R. Civ. P. 42(b), and granted summary judgment against the defendants on the original claim while transferring the remaining counterclaims and third-party claims to the Eastern District of Michigan. See Chrysler Credit Corp., 928 F.2d at 1513. The Eastern District of Michigan granted summary judgment against the defendants on a number of claims and dismissed the remaining, upon which the plaintiff asked the court to certify the money judgment from the Western District of Oklahoma. See Chrysler Credit Corp., 928 F.2d at 1514. The Eastern District of Michigan declined to certify the Oklahoma judgment and upon appeal contended that "jurisdiction over the Oklahoma judgment remained in Oklahoma," which the United States Court of Appeals for the Sixth Circuit agreed with. Chrysler Credit Corp., 928 F.2d at 1514.

The Tenth Circuit determined that the Western District of Oklahoma had not severed the claims correctly under rule 21 of the Federal Rules of Civil Procedure, and thus, the transfer of the case to the Eastern District of Michigan transferred all the claims, including the claim which the Oklahoma court had decided in favor of the plaintiffs. See Chrysler Credit Corp., 928 F.2d at 1519-20. The transfer from Oklahoma to the Eastern District of Michigan, therefore, made the Oklahoma judgment the law of the case, from which the Sixth Circuit allowed "sufficiently flexible

[discretion] to permit departure from rulings in the transferor circuit where clearly warranted."
Chrysler Credit Corp., 928 F.2d at 1520 (citing Skil Corp. v. Millers Falls Co., 541 F.2d 554, 558
(6th Cir. 1976)). The Tenth Circuit ruled that, upon docketing the case in the Eastern District of
Michigan, the Western District of Oklahoma lost jurisdiction over all claims and was unable to
certify the judgment at a later date. See Chrysler Credit Corp., 928 F.2d at 1520-21. From that
point onward, the Tenth Circuit concluded, the Sixth Circuit retained "appellate review of a
[Eastern District of Michigan's] application of the law of the case doctrine governed by the limited
standard of clear error and manifest injustice." Chrysler Credit Corp., 928 F.2d at 1518.

## LAW REGARDING TRANSFER OF VENUE

In 1948, Congress enacted the federal change-of-venue statute, codified at 28 U.S.C.
§ 1404, to allow a district court to transfer an action filed in a proper, though not necessarily
convenient, venue to a more convenient district. That statute provides, in pertinent part: "For the
convenience of the parties and witnesses, in the interest of justice, a district court may transfer any
civil action to any other district or division where it might have been brought." 28 U.S.C.
§ 1404(a). Section 1404(a) affords a district court broad discretion to adjudicate motions to
transfer based on a case-by-case review of convenience and fairness. See Chrysler Credit Corp.,
928 F.2d at 1516. "Recognizing that what is convenient for one litigant may not be convenient for
the other, the Supreme Court has taught that section 1404(a) 'is intended to place discretion in the
district court to adjudicate motions for transfer according to [a] . . . case-by-case consideration of
convenience and fairness.'" Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626
F.3d 973, 977 (7th Cir. 2010)("Research Automation")(quoting Stewart Org., Inc. v. Ricoh Corp.,
487 U.S. 22, 29 (1988)). "The statutory language guides the court's evaluation of the particular
circumstances of each case and is broad enough to allow the court to take into account all factors

relevant to convenience and/or the interests of justice." Research Automation, 626 F.3d at 977.

The statute permits a "flexible and individualized analysis," and affords district courts the

opportunity to look beyond a narrow or rigid set of considerations in their determinations. Stewart

Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [to] consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler Credit Corp., 928 F.2d at 1516 (quoting Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145,

147 (10th Cir. 1967)).

Section 1406 "permits transfer to cure a venue defect." Whiting v. Hogan, 855 F. Supp. 2d

1266, 1284 (D.N.M. 2012)(Browning, J.). It provides: "The district court of a district in which is

filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of

justice, transfer such a case to any district or division in which it could have been brought."

28 U.S.C. § 1406. Although both § 1404(a) and § 1406(a) "were broadly designed to allow

transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is

wrongly or improperly laid." Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).

The "interest of justice" is a separate element of the transfer analysis that relates to the

court system's efficient administration. Van Dusen v. Barrack, 376 U.S. at 626-27. "For this

element, courts look to factors including docket congestion and likely speed to trial in the transferor

and potential transferee forums; each court's relative familiarity with the relevant law; the

respective desirability of resolving controversies in each locale; and the relationship of each

community to the controversy." Research Automation, 626 F.3d at 977 (citations omitted). In some circumstances, "[t]he interests of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." Research Automation, 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-221 (7th Cir. 1986)). The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action. Driggers v. Clark, 422 Fed. App'x. 747, 749-50 (10th Cir. 2011)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

## LAW REGARDING FIRST-TO-FILE RULE

"[T]he 'first to file' rule . . . pertains when two district courts have jurisdiction over the same controversy, affording deference to the first filed lawsuit." U.S. ex rel. Brown Minneapolis Tank Co. v. Kinley Const. Co., 816 F. Supp. 2d 1139, 1149-50 (D.N.M. 2011)(Browning, J.)(quoting Lipari v. U.S. Bancorp NA, 345 Fed. App'x. 315, 317 (10th Cir. 2009)). The Tenth Circuit has held that, "[u]nder this rule, courts consider three factors: '(1) the chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake.'" Wakaya Perfection, LLC v. Youngevity Int'l, Inc., 910 F.3d 1118, 1124 (10th Cir. 2018)("Wakaya Perfection")(quoting Baatz v. Columbia Gas Transmission, LLC, 814 F.3d 785, 789 (6th Cir. 2016)("Baatz")). In addition to these considerations, equitable factors such as "inequitable conduct, bad faith, anticipatory suits, and forum shopping," may also weigh on the decision. Wakaya Perfection, 910 F.3d at 1124 (citing Baatz, 814 F.3d at 789).

The Tenth Circuit has "adopted the first-to-file rule as a baseline." Wakaya Perfection, 910 F.3d at 1124 (citing Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1164 (10th Cir. 1982)). Courts, however, do not apply mechanically the first-to-file rule. See United States ex rel.

Brown Minneapolis Tank Co. v. Kinley Const. Co., 816 F. Supp. 2d at 1150 (citing Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1164 (10th Cir. 1982)). "[T]he first-to-file rule 'permits,' but does not require, a federal district court to abstain from exercising its jurisdiction in deference to a first-filed case in a different federal district court." Wakaya Perfection, 910 F.3d at 1124 (quoting Hospah Coal Co. v. Chaco Energy Co., 673 F.2d 1161, 1164 (10th Cir. 1982)).

The Tenth Circuit recognizes "that 'the first court in which jurisdiction attaches has priority to consider the case' and jurisdiction 'relates back to the filing of the complaint.' As a result, determining the chronology of events typically requires only a comparison of the two filing dates." Wakaya Perfection, 910 F.3d at 1124 (quoting Hospah Coal Co. v. Chaco Energy Co., 673 F.2d at 1163). The Court should also consider "whether the two cases bear substantial overlap in (1) the parties and (2) the issues or claims." District courts in the Tenth Circuit have held that "[i]t is well accepted that 'the parties do not need to be identical' and that '[o]nly similarity or substantial overlap is required.' . . . . 'Similarly, the issues must only be substantially similar in that they seek like forms of relief and hinge on the outcome of the same legal/factual issues.'" Cherokee Nation v. Nash, 724 F. Supp. 2d 1159, 1168 (N.D. Ok. 2010)(Kern, J.)(quoting Shannon's Rainbow, LLC v. Supernova Media, Inc., 683 F. Supp. 2d 1261, 1278-79 (D. Utah 2010)(Stewart, J.); Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 679 F. Supp. 2d 1287, 1289 (D. Kan. 2010)(Marten, J.)).

"After determining the sequence and similarities in the cases, 'court[s] must also determine whether any equitable considerations . . . merit not applying the first-to-file rule in a particular case.'" Wakaya Perfection, 910 F.3d at 1127 (quoting Baatz, 814 F.3d at 789). The Tenth Circuit has noted that the rule may be "disregarded 'to prevent a misuse of litigation in the nature of vexatious and oppressive foreign suits.'" Wakaya Perfection, 910 F.3d at 1127 (quoting O'Hare

Int'l Bank v. Lambert, 459 F.2d 328, 331 (10th Cir. 1972)). Nor should the Court employ the rule

"when doing so would reward forum shopping." Wakaya Perfection, 910 F.3d at 1127 (citing

Span-Eng Assocs. v. Weidner, 771 F.2d 464, 470 (10th Cir. 1985)). Such considerations are not

exhaustive, and their consideration promotes the idea that "the district court cannot resort to a

'rigid mechanical solution'" in applying the first-to-file rule. Wakaya Perfection, 910 F.3d at 1124

(quoting Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952)).

## LAW REGARDING CLASS ACTION CERTIFICATION

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of

Civil Procedure. See Fed. R. Civ. P. 23. All classes must satisfy: (i) all the requirements of rule

23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of

requirements correspond to the three categories of classes that a court may certify. See

Fed. R. Civ. P. 23(a)-(b). The plaintiff[8] bears the burden of showing that the requirements are met,

see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United

States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification

is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice

require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of

allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e

hold that ... rule [23] should be given a liberal rather than a restrictive interpretation, and that

[denying certification] is justified only by a clear showing to that [end]. . . ."). In ruling on a class

certification motion, the Court need not accept either party's representations, but must

---

[8]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification. See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

independently find the relevant facts by a preponderance of the evidence.[9]  See Rutstein v. Avis

Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is

necessary, as a court must understand the claims, defenses, relevant facts, and applicable

substantive law in order to make a meaningful determination of the certification issues.").  "In

determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs

have stated a cause of action or will prevail on the merits, but rather whether the requirements of

Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See

Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle

that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a

rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis

bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class

---

[9]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F.Supp.2d 1178, 1220 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L.Ed.2d 732 (1974)).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Actual, not presumed, conformance with Rule 23(a) remains indispensable." Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-352 (2011)("Wal-Mart"). In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013)(Ginsburg, J.). To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case. This approach is analogous to preliminary injunction practice, and many circuits have endorsed it. See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004). Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis. See

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-22 (1997). In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion. *See Anderson Living Trust v. WPX Energy Production LLC*, 306 F.R.D. 312, 378 n.39 (D.N.M. 2015)(Browning, J.).

### 1. Rule 23(a).

All classes must satisfy the prerequisites of rule 23(a):

**(a) Prerequisites**. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988). "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004)(quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982)(citing *Reed v. Bowen*, 849 F.2d at 1309)). These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively. *See* Fed. R. Civ. P. 23(a).

Rule 23(a)(2) requires that "there are questions of law <u>or</u> fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common

questions of law exist." In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.). See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." Wal-Mart, 564 U.S. at 349.

"Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.). Accord In re Initial Pub. Offering Securities Litigation, 227 F.R.D. 65, 87 (S.D.N.Y. 2004)("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. See 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead

opting to leave personnel matters to the individual store managers' discretion. <u>See</u> 564 U.S. at 343-45. The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decision-making of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice." 564 U.S. at 345. The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," Falcon, 102 S. Ct. at 2364. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of class wide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

<u>Wal-Mart</u>, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, <u>supra</u>, at 132). In <u>EQT Production Co. v. Adair</u>, 764 F.3d 347 (4th Cir. 2014), the United States Court of Appeals for the

Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.
>
> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.
>
> The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In <u>Wal-Mart</u>, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. From this observation, he then concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the class wide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

<u>Wal-Mart</u>, 564 U.S. at 367. Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

## 2. __Rule 23(b)__.

Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

**(b)** Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual putative class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the putative class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in

the particular forum; and

**(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments"). The Court will focus on the most important

form of class action, the (b)(3) damages class action.[10]

---

[10]The Court will briefly address the other class-action types. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified. See Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication. See Fed. R. Civ. P. 23(b)(1)(A). "Incompatible" means more than simply inconsistent. A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings. What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments. See Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res. For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res. Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the res does not pay out the entire res to the first investors to file suit, but, instead, distributes the res fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, supra, at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. See William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed. 2017)("Newberg"). The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

[W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class. For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons. First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal. Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances. Second, the scope of the plaintiff's relief is likely augmented by certifying a class. It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy. Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only

them conceptualize their efforts in group, not individual, terms. Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted). Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. See Fed. R. Civ. P. 23(c)(2)(A).

common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F.Supp.2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement."). As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret ... the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corporation's activities had an antitrust impact, because Comcast's activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. The district court

found, among other things, that the damages resulting from overbuilder-deterrence impact could be calculated on a class wide basis. To establish such damages, the plaintiffs relied solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model which compared actual cable prices in the Philadelphia "Designated Market Area" with hypothetical prices that would have prevailed but for Comcast's allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a class wide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question of "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 569 U.S. at 39. Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a class wide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34. Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, any method of measurement is acceptable so long as it can be applied class wide, no matter

how arbitrary the measurements may be. Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 35 (emphasis in original).

It is clear that <u>Comcast Corp. v. Behrend</u> applies to class wide damages. It is less clear that <u>Comcast Corp. v. Behrend</u>'s language applies to the determination of individual damages. There are three ways that the Court could deal with <u>Comcast Corp. v. Behrend</u> and the determination of individual damage awards. First, the Court could decide that <u>Comcast Corp. v. Behrend</u> applies only to class wide damages and is not controlling at all in the determination of individual damages. Second, the Court could decide that everything that Justice Scalia said about class wide damages also applies to the determination of individual damages. Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to class wide damages. As to the first option, while much could be said of limiting Justice Scalia's opinion to class wide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards. Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether class wide or individual damage awards -- still seem relevant to whether damages are class wide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply <u>Comcast Corp. v. Behrend</u>'s language to the individual determination of damages as it does to class wide damages. The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well-nigh universal." 569 U.S. at 42 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the

Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis. In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class. Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member. The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups. The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims [11] does not typically defeat predominance. See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003). A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[12] Other recurring individual issues

---

[11]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[12]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present uncommon questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed. Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint. Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.

Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James Wm. Moore et al., supra ¶ 23.46[3] (3d ed. 1999)). See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

present more serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[13] (ii) differences in the applicable law in a multi-state, state-law-based class actions,[14] see Castano v. Am. Tobacco Co., 84 F.3d 734, 741

---

[13]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

[14]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in an opinion that predates Wal-Mart and Comcast, stated:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented

by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

> . . . .

> When courts think of efficiency, they should think of market models rather than central-planning models.

> Our decision in [Matter of] Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d [1293] at 1299 [(7th Cir. 1995)]) will yield the information needed for accurate evaluation of mass tort claims.

> . . . .

(5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625. There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance -- with the United States Courts of Appeals for the Seventh and Sixth Circuits on one side and the United States Courts of Appeals for the Third, Tenth, and Eleventh Circuits on the other. The Honorable Richard A. Posner, United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013). Judge Posner poses the predominance question as: "Is it more efficient, in terms

---

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. 559, 568-73 (1996); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)(reversing a nationwide warranty class certification); Spence v. Glock , 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L. Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" Butler v. Sears, Roebuck & Co., 702 F.3d at 362. In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective. See 702 F.3d at 360-61. The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary, a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

> . . . .

> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362. Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend." Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013). On reconsideration, the

Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. [Wal-Mart, 564 U.S. at 338]. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997), it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .
>
> As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.
>
> There is a single, central, common issue of liability: whether the Sears washing machine was defective.
>
> Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364] at 365 [(7th Cir. 2012)] (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[15]

---

[15]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit case:

So how does the Supreme Court's <u>Comcast</u> decision bear on the rulings . . . in our first decision?

<u>Comcast</u> holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges.  <u>Comcast</u> was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages.  [569 U.S. at 37](emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof* )."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed.2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."  (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in <u>Comcast</u>, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in <u>Comcast</u>.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining.  In contrast, any buyer of a

The Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[16]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 678 F.3d at 421 (citation omitted).

That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient

_____

Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore, and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[16]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

for decision-making. Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action." That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones. Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 722 F.3d 838, 859 (6th Cir. 2013)(citations omitted). The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied. See Butler v. Sears, Roebuck & Co., 727 F.3d at 802. This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

[A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense. If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.

The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class. When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(emphases added)(omission in original)(footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." If "after adjudication of the class wide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1170 (11th Cir. 2010)(emphasis in original)(citations omitted).[17]  The Eleventh Circuit, however,

---

[17] The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., 564 F.3d 1256 (11th Cir. 2009), and in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").  If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

imposes a different, more rigorous, second step: the district court's trial plan must spend more time

adjudicating the common questions than it does adjudicating the individual questions. The

Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value

cases that can be fairly and efficiently adjudicated via class action should not be certified[18] -- but

---

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized. The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (emphasis added)(footnote omitted).

[18]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, or quantity; be most important or outstanding." The American Heritage Dictionary of the English Language, supra, at 1032 (emphasis added). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear.  The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses.  We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety.  The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance.  When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues.").  Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members."  Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights.  The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience.  The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party.  Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment.  By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

601 F.3d at 1176 (citations omitted).  These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable.  The only "abridgment of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category.  601 F.3d at 1176.  That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed <u>Castano v. American Tobacco Co.</u> case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted). This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case

that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," <u>see</u> Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

<u>Castano v. American Tobacco Co.</u>, 84 F.3d 734, 735 n.21 (5th Cir. 1996)

<u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part). Despite Judge Niemeyer's concern with creating a circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before <u>Gunnells v. Healthplan Services, Inc.</u> See <u>Zinser v. Accufix Research Inst., Inc.</u> 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001). See <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 167-69 (2d Cir. 2001); <u>Jefferson v. Ingersoll Int'l Inc.</u>, 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

Some have been critical of the piecemeal certification of class action status for claims within a case. See <u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d 734, 745 n.21 (5th Cir. 1996)("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). We did not directly address the propriety of such partial certification in <u>Klay</u>.

<u>Borrero v. United Healthcare of N.Y., Inc.</u>, 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original). The Tenth Circuit also appears to have refrained from taking a side:

Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment. See <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 167-69 (2d Cir. 2001). Compare <u>Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO</u>, 216 F.3d 577, 581 (7th Cir.

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.")(quoting Newberg § 4:49)), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]")(quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24, 117 S. Ct. 2231)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 600 (3d Cir. 2012)(exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must characterize the issues in the case as common or not, and then weigh which issues predominate. Here, that task requires

---

> 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d at 1087.

## ANALYSIS

The Court concludes that the Plaintiffs have not alleged facts sufficient to warrant the Court's reconsideration of Judge Bashant's transfer decision. The Court will deny the Plaintiffs' Motion to Transfer Venue on the basis of the Tenth Circuit's instruction in Chrysler Credit Corp. to abide by the law-of-the-case doctrine regarding transferor court decisions, because: (i) there has been no change to governing law by the subsequent decision of a higher court; (ii) the Plaintiffs have not alleged that new evidence has become available in the Southern District of California that warrants retransfer; (iii) Judge Bashant did not make a clear error in transferring this action to the District of New Mexico; and (iv) there is no "manifest injustice" in declining to reevaluate Judge Bashant's original transfer order. 928 F.2d at 1517. Further, the Court will not apply the United States Court of Appeals for the Fifth Circuit's precedent in Cragar, 706 F.2d 503 (5th Cir. 1983), which held that reconsideration of a transfer order may be warranted by an unanticipated, post-

transfer change in circumstance, because the Court does not believe that the Tenth Circuit would apply this consideration in determining whether the transferee court should depart from the law of the case. Even if the Court applies this standard to the Plaintiffs' post-transfer class withdrawal from <u>Deakin</u>, however, the Plaintiffs' voluntary withdrawal from a pending class action is neither a frustration of the transfer's original purpose nor an "unanticipatable post-transfer" change in circumstance. <u>Cragar</u>, 706 F.2d at 505. Last, the Court does not agree with the Plaintiffs that the Court lacks personal jurisdiction over them and their claims, because the Class Representatives' original consent to join <u>Deakin</u> amounts to consent to the Court's exercise of personal jurisdiction and cannot be revoked. Accordingly, the Court denies the Plaintiffs' Motion to Transfer Venue.

I. **THE COURT WILL APPLY A DEFERENTIAL STANDARD WHEN ANALYZING JUDGE BASHANT'S TRANSFER ORDER AND WILL NOT RETRANSFER THE CASE, BECAUSE THE LAW-OF-THE-CASE DOCTRINE PROMOTES JUDICIAL COHESION AND TENTH CIRCUIT PRECEDENT <u>DOES NOT ADVISE RECONSIDERATION UNDER THESE CIRCUMSTANCES</u>.**

The Court denies the Plaintiffs' Motion to Transfer Venue, because, under <u>Chrysler Credit Corp.</u>, the Court should apply law of the case principles to decisions that the transferor court made, including the transfer order.[19] <u>See</u> 928 F.2d at 1516. The transferee court may reconsider a transferor court's decision "when the governing law has been changed by the subsequent decision

---

[19]The Court notes that the law-of-the-case doctrine is "merely a 'presumption, one whose strength varies with the circumstances.'" <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d 1217, 1225 (10th Cir. 2007)(quoting <u>Avitia v. Metro. Club of Chicago, Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)). The doctrine, nonetheless, "pertains both to rulings by district courts, <u>see</u>, <u>e.g.</u>, <u>Clark v. State Farm Mut. Auto. Ins. Co.</u>, 590 F.3d 1134, 1140 (10th Cir. 2009)," as well as "by previous panels in prior appeals in the same litigation, <u>see</u>, <u>e.g.</u>, <u>United States v. Wardell</u>, 591 F.3d 1279, 1300 (10th Cir. 2009)." <u>Bishop v. Smith</u>, 760 F.3d 1070, 1082 (10th Cir. 2014). Previous transfer decisions by sister courts are a circumstance in which the law-of-the-case principles apply, and this presumption is difficult to overcome. <u>See</u> <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. at 819 ("But as '[t]he doctrine of the law of the case is . . . a heavy deterrent to vacillation on arguable issues,' 1B Moore's ¶ 0.404[1], at 124, such reversals [of a transfer decision] should necessarily be exceptional."); <u>Chrysler Credit Corp.</u>, 928 F.2d at 1516.

of a higher court, when new evidence becomes available, when a clear error has been committed or to prevent manifest injustice." Chrysler Credit Corp, 928 F.2d at 1516. The Plaintiffs, in their original Motion to Transfer Venue and Reply, do not address the test Chrysler Credit Corp. describes or the situations in which it is appropriate for a transferee court to reconsider a transferor court's decision. See Motion at 2; Reply at 1-2. Magellan HRSC asserts that none of the Chrysler Credit Corp. elements exist in this case and thus that reconsidering Judge Bashant's transfer decision is inappropriate. See Response at 3-4. The Court agrees with Magellan HRSC that, after a review of the Chrysler Credit Corp. considerations, the law-of-the-case doctrine applies in this action and, therefore, the Court will not retransfer the case.

The Court will not depart lightly from the law of the case. See Fish v. Schwab, 957 F.3d at 1139; Bishop v. Smith, 760 F.3d at 1082. The Court, as the transferee, gives great weight to the transferor court's original decision. See Christianson v. Colt Indus. Operating Corp., 486 U.S. at 816 ("[T]he policies supporting the [law-of-the-case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law."); Schroeder v. Wichita Police Dep't, No. 20-1216 DDC/GEB, 2020 WL 5573111, *2 (D. Kan. 2020)(Crabtree, J.). The Plaintiffs have a heavy burden to prove that this action falls into one of the exceptions for reconsideration Chrysler Credit Corp. identifies, as "reversals should necessarily be exceptional." Christianson v. Colt Indus. Operating Corp., 486 U.S. at 819. The Court concludes, upon review, that the Plaintiffs have not sustained this burden, and, consequently the Court will adhere to the law of the case and not change Judge Bashant's decision.

### A. NO HIGHER COURT'S SUBSEQUENT DECISION HAS CHANGED THE APPLICABLE GOVERNING LAW.

Because the applicable governing law remains unchanged, the Court will not reverse Judge Bashant's decision to transfer the case. See Chrysler Credit Corp., 928 F.2d at 1516. Magellan

HRSC asserts that there are no higher-court decisions that have changed the governing law after Judge Bashant's decision to transfer the case.  See Response at 4.  Moreover, the Plaintiffs do not cite any recent higher-court decision that would satisfy this exception to the law-of-the-case doctrine.  See Transfer Memo 1-11; Reply at 1-9.  See Response at 3.  The Tenth Circuit cited to the United States Court of Appeals for the Second Circuit, Chrysler Credit Corp., 928 F.2d at 1516 (citing Crane Co. v. Am. Standard, Inc., 603 F.2d 244, 248 (2nd Cir. 1979)), which stated: "Where, however, 'before a case in a district court has proceeded to final judgment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error, no principle of the law of the case would warrant a failure . . . to correct the ruling,'" Crane Co. v. Am. Standard, Inc., 603 F.2d 244, 248 (2nd Cir. 1979)(quoting Zdanok v. Glidden Co., 327 F.2d 944, 951 (2d Cir. 1964)).  The Court, therefore, concludes that there has been no change in governing law, given that the parties do not cite, and the Court cannot find, any subsequent decision from the Tenth Circuit or the Supreme Court that impacts this action.

**B.  NO NEW EVIDENCE HAS COME TO LIGHT THAT MAKES RETRANSFER APPROPRIATE.**

The parties agree that no new evidence is available that warrants retransferring this case to the Southern District of California.  See Response at 3; Reply at 1-2.  The Tenth Circuit introduced this consideration by citing to a case in which new evidence regarding a statute's repeal, that came to light after an interlocutory order, was a proper basis for "re-examining a prior ruling of another district judge in the same case. . . . [as] the 'law of the case' doctrine must yield to rational decision making." Chrysler Credit Corp., 928 F.2d at 1516 (citing Peterson v. Lindner, 765 F.2d 698, 704 (7th Cir. 1985)).  The Court concludes that there is no evidence that has come to light after Judge Bashant's transfer decision that warrants changing the established law of the case in this action.

**C.  JUDGE BASHANT DID NOT ERR IN TRANSFERRING THIS ACTION TO**

**THE DISTRICT OF NEW MEXICO.**

The Court agrees with Magellan HRSC's contention that Judge Bashant did not err in transferring this action to the District of New Mexico. <u>See</u> Response at 3. Magellan HRSC maintains that, at the time that Judge Bashant transferred this action, the Class Representatives and various other class members were voluntary members of <u>Deakin</u> and, therefore, that the interests of judicial efficiency favored transfer. <u>See</u> Response at 3. The Plaintiffs do not contest this assertion. <u>See</u> Reply at 1-2.

Clear error is defined as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." <u>Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.</u>, 259 F.3d 1226, 1236 (10th Cir. 2001)(quoting <u>Brown v. Presbyterian Healthcare Serv.</u>, 101 F.3d 1324, 1331 (10th Cir. 1996)). The Court agrees that Judge Bashant's reasoning in transferring this action to the District of New Mexico is properly based upon the first-to-file rule and aimed at increasing judicial efficiency and consistency. <u>See</u> SDC Order at 9-10. The Court agrees that the parties in both <u>Deakin</u> and this action are substantially similar; Magellan HRSC is a defendant in both actions, and the classes of Plaintiffs are substantially similar to the point of "encompass[ing] at least some of the same individuals." SDC Order at 5. As Judge Bashant notes, <u>Deakin</u>'s class consists of "employees who worked for Defendants in at least one workweek for over 40 hours . . . [and] who received their pay on a salary basis; work[ing] under a job title . . . containing the terms 'Care Coordinator' or 'Care Manager,'" while the Plaintiffs' proposed class consists of "employees of Magellan who . . . were employed in California in the capacity of a 'care manager' or 'senior care manager' and classified as an exempt employee." SDC Order at 4 (quoting Complaint ¶ 37, at 10). The Court also agrees that the primary issue in both <u>Deakin</u> and this action is the alleged misclassification of employees as exempt from overtime pay. <u>See</u> SDC Order at 8 ("The Court

finds it important to focus on the similarity in the underlying issues: the alleged misclassification and unpaid overtime."). The Court also agrees with Judge Bashant that transfer will not prejudice the Plaintiffs and that "[i]nstead Magellan will be prejudiced if it is forced to defend itself against the same underlying issue in two separate courts." SDC Order at 9. The Court has no sound basis to question Judge Bashant's judgment, much less to conclude that there has been a commission of a "clear error," and thus declines to order transfer based on this consideration. See Chrysler Credit Corp., 928 F.2d at 1516.

### D. NO MANIFEST INJUSTICE IS AT STAKE BY DECLINING TO RE-TRANSFER THIS ACTION.

The parties agree: (i) that a fair trial may be achieved in the District of New Mexico; and (ii) that any judgment obtained may be enforced in either jurisdiction. See Transfer Memo at 7; Response at 4. Neither party, therefore, asserts that manifest injustice is at stake in this decision. See Transfer Memo at 7; Response at 4. This last consideration from Chrysler Credit Corp., to "prevent manifest injustice," is tied to the previous consideration of commission of a "clear error." 928 F.2d at 1516 (citing Arizona v. California, 460 U.S. 605, 618 n.8 (1983)("[I]t is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.")). "Courts have defined manifest injustice as 'more than just a clear and certain prejudice to the moving party, but also a result that is fundamentally unfair in light of governing law.'" Thymes v. Verizon Wireless, Inc., No. CIV 16-0066 KG/WPL, 2016 WL 9777487, *2 (D.N.M. 2016)(Gonzalez, J.)(quoting Smith v. Lynch, No. 10-1302 (BAH), 2015 WL 4324167, *3 (D.D.C. 2015)(Howell, J.)). The Court concludes, and the parties do not contest, that no manifest injustice is at stake in declining to grant this transfer, because, given that a fair trial and enforceable judgment may be achieved in either district, keeping the case in the District of New Mexico does not risk "fundamentally unfair" results. Thymes v. Verizon Wireless, Inc., 2016

WL 9777487 at *2.

### E. DISCRETIONARY FACTORS THAT A COURT MAY CONSIDER IN A FIRST-INSTANCE TRANSFER REQUEST DO NOT OUTWEIGH ESTABLISHED LAW-OF-THE-CASE PRINCIPLES IN THE TENTH CIRCUIT.

None of the remaining discretionary factors in a consideration of a transfer decision warrant abandoning the law of the case. See Chrysler Credit Corp., 928 F.2d at 1516. The Tenth Circuit has not left plaintiffs facing unfavorable transfer orders without remedy, explaining that "[b]ecause an appeal from a transfer order filed after the physical transfer of the record would be futile, the preferred approach is to delay physical transfer of the papers in the transferred case for a long enough time to allow the aggrieved party to file a mandamus petition" in the transferor Court of Appeals. Chrysler Credit Corp., 928 F.2d at 1517. In this case, the Court concludes that the Plaintiffs took the proper route to contesting the original transfer decision in the Southern District of California. Nonetheless, Judge Bashant transferred the case to the District of New Mexico. See SDC Order at 2. The Plaintiffs did not seek mandamus or attempt to appeal Judge Bashant's transfer decision after the order; consequently, the Court concludes that the law-of-the-case doctrine applies. See Chrysler Credit Corp., 928 F.2d at 1517. See also Lane v. Page, 727 F. Supp. 2d 1214, n.9 (D.N.M. 2010)(Browning, J.)(citing Clark v. State Farm Mut. Auto. Ins., 590 F.3d 1134, 1140 (10th Cir. 2009)("Law of the case is a doctrine that binds the trial court after an appeal."). Barring the existence of a Chrysler Credit Corp. consideration that warrants reconsideration of Judge Bashant's transfer decision, the Court will not allow "lawyers and litigants alike to believe that if at first you don't succeed, just try again." Entek GRB, LLC v. Stull Ranches, LLC, 840 F.3d 1239, 1240 (10th Cir. 2016).

The Court declines to retransfer this case to the Southern District of California. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any

civil action to any other district or division where it might have been brought or to any district or district or division to which all parties have consented." 28 U.S.C. § 1404(a). The Court should determine "(i) whether the case could have properly been brought in the proposed transferee district; and (ii) whether the convenience of parties and witnesses, and the interests of justice, favor a transfer." Front Row Techs., LLC v. NBA Media Ventures, LLC, 163 F. Supp. 3d 938, 1004 (D.N.M. 2016)(Browning, J.)(citing Navajo Nation v. Urban Outfitters, Inc., 918 F. Supp. 2d 1245, 1253 (D.N.M. 2013)(Hansen, J.)). The parties agree that the Plaintiffs could have brought the action in the Southern District of California. See Transfer Memo at 4-5; Response at 1. The Plaintiffs filed this action in California State court, where Magellan HRSC removed it to the Southern District of California. See SDC Order at 2-3. The Southern District of California was an appropriate venue for this case; and the original transfer decision made by Judge Bashant did not rest on any defects regarding venue or jurisdiction over Magellan HRSC, but, instead, rested on the first-to-file rule. See SDC Order at 3. The Court therefore will focus on discretionary factors concerning a transfer order's convenience and effect on the interests of justice. These factors include: (i) the plaintiffs' choice of forum; (ii) accessibility of witnesses and of other sources of proof; (iii) the cost of making necessary proof; (iv) questions regarding a judgment's enforceability; (v) relative advantages and obstacles to a fair trial between the different venues; (vi) congested docket issues; (vii) the possibility of questions arising in the area of conflict of laws; (viii) advantages of a local court determining questions of local law; and (ix) other considerations that make a trial efficient. See Chrysler Credit Corp., 928 F.2d at 1516.

Having reviewed these discretionary factors, the Court concludes retransfer is inappropriate. The Plaintiffs stress that a number of witnesses and sources of proof for their claims are located in California. See Motion at 2. They also emphasize that California substantive laws

govern the claims in this action, but mistakenly attempt to apply an outcome determinative test to this consideration to advocate for a retransfer.[20]  See Motion at 2.  The Plaintiffs also argue that the time and expense associated with proving these claims "will be significantly less in California, than New Mexico."  See Motion at 2.  The Plaintiffs have not shown, however, that the location of witnesses and necessary proofs outweigh law-of-the-case considerations.   In reaching this conclusion, the Court notes that only one of the three Class Representatives currently resides in California.  See Jahnke Decl. ¶ 6, at 3.  The Court also takes notice of the seven proposed witnesses that are shown to reside in California through their LinkedIn profiles.[21]  The Court concludes that

---

[20]The Plaintiffs assert that the difference between California and federal, as well as New Mexico law, on these issues is "outcome determinative."  Transfer Memo at 9.  The Plaintiffs appear to apply this test mistakenly, originally developed by the Supreme Court of the United States to distinguish what is "procedural" from what is "substantive" law in federal choice of law rules.  See Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109-10 (1945)("York"); Hanna v. Plumer, 380 U.S. 460, 466-67 (1965)("'Outcome determination' analysis was never intended to serve as a talisman.  Indeed, the message of York itself is that choices between state and federal law are to be made not by application of any automatic, 'litmus paper' criterion . . . .").  The Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), doctrine makes clear that the law to be applied "[e]xcept in matters governed by the Federal Constitution or by acts of Congress . . . is the law of the state."  Erie R.R. Co. v. Tompkins, 304 U.S. at 78.

[21]The Plaintiffs request that the Court take judicial notice of the LinkedIn Profiles of seven witnesses listed by Magellan HRSC in the Joint Status Report.  See Request for Judicial Notice in Support of Plaintiffs' Motion to Transfer Venue, filed July 8, 2020 (Doc. 48-1)("Notice Request").  Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court"; or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."  United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201).  A court has discretion  to  take judicial notice of  such facts,  regardless of  whether requested.  See Fed. R. Evid. 201(c).  On the other hand, if a party requests that the court take judicial notice of  certain  facts  and  supplies  the  necessary  information  to  the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d). Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed."  Fed. R. Evid. 201(e).
     The Court infers that the Plaintiffs request this notice to exhibit witness' locations.  The Court will take judicial notice of these exhibits, but notes that district courts have consistently

because of Magellan HRSC's posture in relation to this retransfer request, that this consideration does not prohibit the Court from adhering to the law of the case. <u>See</u> Response at 5. The Court also concludes that, while the Plaintiffs may prefer to have a California court hear this action, a court in the District of New Mexico is able to apply California substantive law. <u>See</u> Motion at 2. The Court concludes that these considerations do not outweigh Judge Bashant's conclusion that were the action to stay in the Southern District of California, Magellan HRSC would have to defend itself, concerning the same allegation, in three separate courts. <u>See</u> SDC Order at 9. The Court concludes that these arguments do not support retransfer.

In considering the interests of justice, the Court looks to "factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." <u>Research Automation</u>, 626 F.3d at 977 (citing <u>Chicago, Rock Island & Pac. R.R. Co. v. Igoe</u>, 220 F.2d 299, 303 (7th Cir. 1955; <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 645 (1964); <u>Allied Van Lines, Inc. v. Aaron Transfer & Storage Inc.</u>, 200 F. Supp. 2d 941, 946 (N. D. Ill. 2002)(Castillo, J.); <u>Hanley v. Omarc, Inc.</u>, 6 F. Supp. 2d 770, 777 (N. D. Ill. 1998)(Alesia, J.)). The Plaintiffs state that "[t]he interests of justice favor a transfer of this action . . . because this action involves claims under California law

---

discounted LinkedIn profiles as reliable means of acquiring information. <u>See</u> <u>Kelly v. Unisys Corp.</u>, No. 19-cv-03237-PAB-MEG, 2021 WL 1192932, *7 n.16 (D. Colo. 2021)(Brimmer, C.J.); <u>Morrison v. Ocean State Jobbers, Inc.</u>, 290 F.R.D. 347, 362 n.10 (D. Conn. 2013)(Thompson, J.). The Court agrees that a LinkedIn profile is not a generally "accurate and ready . . . source whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), particularly regarding a potential witness' domicile, as a person's location on their profile may be changed easily and unilaterally at any moment by the social media profile's owner. Nevertheless, the Court takes notice of the seven LinkedIn profiles of individuals listed by Magellan HRSC as witnesses because it does give context, if not cemented specifics, to the necessities of continuing this litigation in the District of New Mexico.

involving California employees, and the vast majority of witnesses and sources of proof are located in California." Motion at 2. The Plaintiffs make no argument regarding docket congestion and trial speed. <u>See</u> Transfer Memo at 7-8. The Court concludes that there is no indication from the record that retransferring this case would result in a faster resolution of the Plaintiffs' case. <u>See</u> Transfer Memo at 7-8. Moreover, the Plaintiffs and Magellan HRSC agree that a judgment rendered in the District of New Mexico would be enforceable and that a fair trial may be achieved in either venue. <u>See</u> Transfer Memo at 7; Response at 4. The Court concludes that these discretionary factors provide slim support for changing another district court's transfer decision, which weighs these same considerations, and decides this action is best situated in the District of New Mexico to "maximize judicial efficiency and consistency." SDC Order at 11.

Upon review of the discretionary factors and the considerations set out in <u>Chrysler Credit Corp.</u>, the Court concludes that the law of the case should not change in this action, because (i) a subsequent decision by a higher court has not changed the law governing transfer orders; (ii) no new evidence is available; (iii) Judge Bashant did not err in transferring this action; and (iv) a manifest injustice is not at stake by declining this transfer motion. Accordingly, the Court declines to engage in a "perpetual game of jurisprudential ping-pong" by retransferring this case. <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. at 819.

## II.  THE COURT WILL NOT RETRANSFER THIS ACTION BECAUSE OF AN <u>UNANTICIPATED POST-TRANSFER CHANGE IN CIRCUMSTANCE</u>.

The Court will not retransfer this action because of the Plaintiffs' post-transfer withdrawal from <u>Deakin</u>. The Plaintiffs urge that the law-of-the-case doctrine should not apply, because their post-transfer withdrawal from <u>Deakin</u> "undercut the original purpose of the transfer to 'best serve the interests of judicial efficiency and avoid duplicative litigation.'" Reply at 4 (quoting SDC Order at 10). Consequently, the Plaintiffs argue, the Court should apply the Fifth Circuit's

precedent in <u>Cragar</u>, and, therefore, "consider transfer under 28 U.S.C. § 1404(a) on first instance." Reply at 5. The Court is not persuaded that "unanticipated post-transfer events [that] frustrate the original purpose for transfer" is a consideration the Tenth Circuit would follow, because of its treatment of <u>Cragar</u> in <u>Chrysler Credit Corp</u>. <u>Cragar</u>, 706 F.2d at 505. Nonetheless, were the Court to accept this consideration to find an exception to applying the law-of-the-case doctrine, the Plaintiffs' post-transfer withdrawal from <u>Deakin</u> is neither "unanticipatable" nor does it "frustrate the original purpose for transfer." <u>Cragar</u>, 706 F.2d at 505. The Plaintiffs have had the option to withdraw from <u>Deakin</u> and have exercised this option both before and after Judge Bashant's transfer order. <u>See</u> SDC Order at 5-6. The Plaintiffs' subsequent withdrawal has not upset any of Judge Bashant's original considerations in granting Magellan HRSC's transfer request. <u>See</u> SDC Order at 9-11.

> **A.    THE COURT WILL NOT RECONSIDER JUDGE BASHANT'S TRANSFER ORDER, BECAUSE THE TENTH CIRCUIT WOULD NOT ALLOW A POST-TRANSFER CHANGE IN CIRCUMSTANCE TO UPSET THE LAW-OF-THE-CASE DOCTRINE.**

The Court is not convinced that an "unanticipatable post-transfer event" which changes the case's circumstances is an appropriate consideration to create an exception to applying the law-of-the-case doctrine in the Tenth Circuit.[22] <u>School-Link</u>, 2006 WL 1064111 at *4 (quoting <u>Cragar</u>,

---

[22]The Court will apply faithfully the Tenth Circuit's precedent as it stands in <u>Chrysler Credit Corp</u>. On a clean slate, however, the Court believes that there is utility to such a consideration with regard to retransferring. Accordingly, if the Court were writing on a clean slate, which it is not, it would consider whether there has been an unanticipable change in circumstances when evaluating a motion to retransfer. In circumstances that are totally unforeseen to the parties and that frustrate the transfer's purpose, <u>School-Link</u>'s reasoning makes sense, because a decision to retransfer "simply represents a decision that the case *then* is better tried in the original forum for reasons that became known after the original transfer order." 2006 WL 1064111 at *4 (emphasis in original). For example, such circumstances could include the transferee judge's death, a party's unexpected dismissal, or other events that largely are outside the individual parties influence. <u>See</u>, <u>e.g.</u>, <u>Castillo v. United Air Lines, Inc.</u>, No. 88-C-6288, 1996 WL 332669 (N.D. Ill. 1996)(Conlon, J.)(concluding that the death of the presiding judge was a "classic case of

706 F.2d at 505). Regarding transfer decisions, higher courts are clear: there is a heavy presumption against retransferring a case. See Christianson v. Colt Indus. Operating Corp., 486 U.S. at 816 (explaining that "the policies supporting the [law-of-the-case] doctrine apply with even greater force to transfer decisions than to decisions of substantive law; transferee courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send litigants into a vicious circle of litigation."); Chrysler Credit Corp., 928 F.2d at 1516 (explaining that "traditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court, including its transfer order."). The Court, therefore, concludes that the Chrysler Credit Corp. considerations are all that a district court in the Tenth Circuit should consider in a retransfer decision and declines to consider post-transfer change in circumstance as a means of retransferring a case. See 928 F.2d at 1516-18 ("[R]eview of the transferee court's application of law of the case generally is limited to the question of whether the transferor court's rulings were

---

changed circumstance"); HAB Carriers, Inc. v. Arrow Truck Sales, Inc., No. 07-4390-GEB-ES, 2009 WL 2589180, at *3 (D.N.J. 2009)(Brown, C.J.)(concluding that a party's unanticipated dismissal two years after transfer, prompted by new evidence found during discovery, was an "unforeseeable post-transfer event"). Federal Practice & Procedure has discussed the consideration, stating

> the doctrine of the law of the case and notions of judicial comity suggest that the decision of a coordinate court should not be reconsidered. . . . A motion to retransfer is perfectly appropriate, however, on a showing of changed circumstance, particularly when such developments would frustrate the purpose of the change of venue.

15 Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure, § 3846 (4th Ed. 2021). The Court, however, notes that the Chrysler Credit Corp. considerations deal directly with a number of "unanticipatable post-transfer events," such as change in governing law and discovery of new evidence, which cover a broad swath of the events that may upset the original purpose of a transfer. Cragar, 706 F.2d at 505. If the Court were writing on a clean slate, however, it would consider unanticipable changes in circumstances in retransfer decisions because it would allow the Court to account for other factors entirely outside of the parties' control.

'clearly erroneous and would work a manifest injustice.'")(quoting Arizona v. California, 460 U.S. 605, 618 n.8 (1983)).

The Tenth Circuit's decision in Chrysler Credit Corp. cites the Fifth Circuit's decision in Cragar to support the proposition that a transferee court should not reevaluate a transferor court's transfer order. See Chrysler Credit Corp., 928 F.2d at 1516. Notably, several lines down in the Tenth Circuit's Chrysler Credit Corp. opinion, as it discusses situations in which a prior ruling of a transferor court may be reconsidered, Chrysler Credit Corp. does not include "unanticipatable post-transfer events" that frustrate the transfer's original purpose. 928 F.2d at 1516. See Cragar, 703 F.2d at 505. The Tenth Circuit's acknowledgement of the Fifth Circuit's precedent and subsequent lack of incorporation indicates that such a consideration is not a situation in which "[a] prior ruling of a transferor court therefore may be reconsidered." Chrysler Credit Corp., 928 F.2d at 1516. Moreover, the Fifth Circuit decided Cragar in 1983; if the Tenth Circuit has intended to adopt its "unanticipatable post-transfer events" consideration, it has had ample time over the past thirty-eight years to do so. Cragar, 702 F.2d at 503. See, e.g., In re HealthTrio, Inc., 653 F.3d 1154, 1162 (10th Cir. 2011). The Court concludes that the Tenth Circuit's treatment of Cragar, coupled with its continued disregard of Cragar's "unanticipatable post-transfer events" consideration, signal the Tenth Circuit's unwillingness to apply this consideration.

This conclusion is also consistent with the Tenth Circuit's opinions discussing law-of-the-case doctrine exceptions outside of transfer orders. See Mayer v. Bernalillo Cnty., No. 18-0666-JB-SCY, 2019 WL 130580, *24-*26 (D.N.M. 2019)(Browning, J.)(discussing the Tenth Circuit's law-of-the-case doctrine and grounds that justify departing from it). The Tenth Circuit, regarding the law-of-the-case doctrine outside of cases with jurisdictional defects, has said

> three "exceptionally narrow" grounds justify departing from the law-of-the-case doctrine: "(1) when the evidence in a subsequent trial is substantially different;

(2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice."

Huffman v. Saul Holdings Ltd. P'ship, 262 F.3d 1128, 1133 (10th Cir. 2001)(quoting McIlravy v.

Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000)). Outside of (i) a higher court's

subsequent decision that changes governing law; (ii) new evidence coming to light; (iii) the

commission of a clear error; or (iv) the need to prevent manifest injustice, a transferee court should

not reconsider the transfer decision of the transferor court. Chrysler Credit Corp., 928 F.2d at

1516. Consequently, the Court concludes that unanticipated post-transfer changes in circumstance

do not provide grounds to reconsider Judge Bashant's transfer order, because the Tenth Circuit,

although relying on Cragar, did not discuss unanticipable changes in circumstances.

**B.      THE COURT WOULD REFUSE TO RETRANSFER THIS CASE EVEN WERE IT TO CONSIDER "UNANTICIPATABLE POST-TRANSFER EVENTS," BECAUSE THE PLAINTIFFS' WITHDRAWAL FROM <u>DEAKIN</u> IS NEITHER "UNANTICIPATABLE" NOR DOES IT "FRUSTRATE THE ORIGINAL PURPOSE" OF THE TRANSFER.**

Cragar held that a transferee court may reconsider an original transfer order "where the

original purposes of the transfer have been frustrated by an unforeseen later event." 706 F.2d at

505 (citing 15 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3846 (1976).

The parties agree that the Court may apply this consideration to depart from the law of the case.

See Reply at 2; Response at 4. The parties disagree, however, whether such a change in

circumstance must be "unanticipatable." Reply at 4-5 (citing Cragar, 706 F.2d at 505)(arguing

that an "unanticipatable" change is needed only if the party requesting the retransfer also requested

the original transfer)); Response at 4 (citing Cragar, 706 F.2d at 505)(arguing that any change in

circumstance that warrants retransfer must be "unanticipatable," and that the requesting party's

disposition relative to the original transfer request is immaterial)). The Plaintiffs contend that their

withdrawal from <u>Deakin</u> is an appropriate post-transfer change in circumstance that frustrates Judge Bashant's first-to-file consideration for transfer.  <u>See</u> Reply at 4.  Magellan HRSC urges the Court to conclude that the Class Representatives' withdrawal from <u>Deakin</u> was anticipatable, and thus, unable to warrant a reconsideration of Judge Bashant's order.  <u>See</u> Response at 4.

The Fifth Circuit's opinion in <u>Cragar</u> does not require a district court to consider whether the party requesting retransfer also requested the original transfer of the action.  <u>See</u> 706 F.2d at 505.  <u>Cragar</u>'s instruction on allowing reconsideration of a transfer decision states:

> We have said: "If the motion to transfer is granted and the case is transferred to another district, the transferee-district should accept the ruling on the transfer as the law of the case and should not retransfer 'except under the most impelling and unusual circumstances' or if the transfer order is 'manifestly erroneous.'" <u>United States v. Koenig</u>, 290 F.2d 166, 173 n.11 (5th Cir. 1961), <u>aff'd</u>, 396 U.S. 121 (1962). . . .

> It does not follow, however, that a transferee court is powerless to act where the original purposes of the transfer have been frustrated by an unforeseen later even.  <u>See</u> 15 C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 3846 (1976).  When such unanticipatable post-transfer events frustrate the original purpose for transfer, a return of the case to the original transferor court does not foul the rule of the case nor place the transferee court in a position of reviewing the decision of its sister court. It, instead, represents a considered decision that the case <i>then</i> is better tried in the original forum for reasons which became known after the original transfer order.

<u>Cragar</u>, 706 F.2d at 505 (emphasis in original).  The Court reads <u>Cragar</u> to instruct that a post-transfer event which warrants retransfer must be "unanticipatable."  <u>Cragar</u>, 706 F.2d at 505.  The Court does not agree with the Plaintiffs' argument that the post-transfer event may be anticipatable so long as the party requesting retransfer did not request the original transfer.  Reply at 4-5 (citing <u>Cragar</u>, 706 F.2d at 505).  The Court concludes that a post-transfer event that warrants retransfer must be "unanticipatable," regardless of the requesting party's position on the original transfer request.  <u>Cragar</u>, 706 F.2d at 505.

Judge Bashant, in the original transfer order, notes that "Plaintiff Coffin sent a letter to

plaintiffs' counsel in <u>Deakin</u> withdrawing her opt-in but the other two named Plaintiffs (Kimberley Willmott and Brenda Kasaty) have not withdrawn their opt-ins to the <u>Deakin</u> action." SDC Order at 5-6. The Court concludes that this action shows that, before the original transfer decision, the Class Representatives understood that they had the opportunity to withdraw their opt-ins to <u>Deakin</u>. The Court, after reviewing the record, concludes that the Class Representatives' actions regarding withdrawal from <u>Deakin</u> before Judge Bashant's transfer order make their post-transfer withdrawal from <u>Deakin</u> anticipatable.

The Plaintiffs maintain that, whether anticipated or not, their withdrawal from <u>Deakin</u> frustrates the original purpose of Judge Bashant's transfer order. <u>See</u> Reply at 4. The Plaintiffs urge the Court to take <u>School-Link</u> as instructive and retransfer this case, because a retransfer "simply represents a decision that the case *then* is better tried in the original forum for reasons which became known after the original transfer order." Reply at 4 (quoting <u>School-Link</u>, 2006 WL 1064111 at *4 (emphasis in original)). <u>School-Link</u> involved the transfer under the first-to-file rule from the Central District of California of a case containing compulsory counterclaims tied to an action pending before the District of Kansas. <u>See</u> 2006 WL 1064111 at *4. The claim in the District of Kansas to which the transferred compulsory counterclaims were tied related to a non-disclosure and confidentiality agreement, which contained a forum selection clause that dictated claims related to this agreement must be brought in California. <u>See</u> <u>School-Link</u>, 2006 WL 1064111 at *4. The claim related to the forum selection clause was dismissed from the District of Kansas after the original transfer. <u>School-Link</u>, 2006 WL 1064111 at *4. The District of Kansas found that the dismissal frustrated the original purpose of transferring the compulsory counterclaims, and thus, retransferred the case to Central District of California. <u>School-Link</u> , 2006 WL 1064111 at *4.

School-Link is not analogous to this action, because: (i), here, the decision to withdraw from Deakin, unlike a pending Motion to Dismiss before a district court, was within the Class Representatives' unilateral control; (ii) the original action, Deakin, which prompted Judge Bashant to apply the first-to-file rule, is still pending in the District of New Mexico, containing similar parties and issues; and (iii) School-Link did not present the possibility of inconsistent judgments on an underlying issue. See 2006 WL 1064111 at *4. Consequently, the Plaintiffs' post-transfer withdrawal from Deakin has not frustrated the original purpose of Judge Bashant's transfer order. Judge Bashant's purpose in transferring this action to the District of New Mexico rests on the first-to-file rule, as well as other considerations of fairness, consistency, and judicial efficiency. See SDC Order at 3, 9-11. The Plaintiffs' primary argument regarding frustration of purposes relies on their contention that the withdrawal from Deakin means the parties in the two cases are no longer similar and thus that the first-to-file rule no longer applies. See Reply at 2. The Court concludes, however, that Judge Bashant's purpose for the transfer did not rest singularly upon whether the Class Representatives were members of the Deakin action; in fact, Judge Bashant notes:

> The FLSA collective and California putative class will encompass at least some of the same individuals. The larger group of the putative California class (all care managers and senior care managers who were employed in California and classified as exempt employees) would encompass some of the Deakin collective (care coordinators and care managers who worked at least one workweek for over forty hours in one workweek over the past three years). And vice versa: some of those who are part of the collective in Deakin may also be employed in California. Therefore, both classes seek to represent at least some of the same individuals.

SDC Order at 5. Judge Bashant's reasoning supports the current state of the two actions, as approximately forty-five of the members of the Plaintiffs' proposed class are also members of the

collective in <u>Deakin</u>.[23]  <u>See</u> Tr. at 8:8-10 (Ostroff).

Beyond the parties' similarity, the underlying issue of the two actions remains the same: whether Magellan HRSC misclassified certain employees as exempt from overtime pay.  <u>See</u> SDC Order at 8-9.  Judge Bashant also transferred the case to the District of New Mexico in the interests of fairness, consistency, and judicial efficiency.  <u>See</u> SDC Order at 9-10.  The Court concludes that Judge Bashant's concern that Magellan HRSC "would have to defend itself in three different courts on the issue of failure to pay overtime" still stands were the Court to retransfer this action.  SDC Order at 9-10, n.3.  Were the Court to retransfer, the possibility of inconsistent judgments and thus collateral estoppel complications which Judge Bashant considered, also stands.  <u>Parklane Hosiery Co., Inc. v. Shore</u>, 439 U.S. 322 (1979)("Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.").  <u>See</u> SDC Order at 8.  Further, having both cases in the District of New Mexico maximizes judicial efficiency by allowing the underlying issue of the FLSA, New Mexico, and California claims -- whether Magellan HRSC misclassified employees as exempt from overtime pay and underpaid these employees as a result -- to be litigated before one court.  <u>See</u> SDC Order at 10.  Consequently, the Court concludes that the Class Representatives' withdrawal from the collective in <u>Deakin</u> has not frustrated Judge Bashant's original purposes for transferring this action to the District of New Mexico.

_____

[23]The Court notes that this information comes from the Transcript of the Hearing held on August 7, 2020.  The Court cannot find this information in any materials the parties submitted to the Court.

## III. THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER THE PLAINTIFFS, BECAUSE THEY HAVE CONSENTED TO THE DISTRICT OF NEW MEXICO'S PERSONAL JURISDICTION.

The Plaintiffs dispute the District of New Mexico's exercise of personal jurisdiction over them. See Reply at 5. The Plaintiffs insist that, following their withdrawal from Deakin, they have no minimum contacts with the District of New Mexico, nor have they consented, availed themselves of New Mexico's laws and courts, or appeared in the District of New Mexico to establish personal jurisdiction. See Reply at 5. The Court does not agree with the Plaintiffs' contention, instead the Court concludes that it may exercise personal jurisdiction over the Plaintiffs because of their affirmative consent to join Deakin. See Phillips Petroleum Co. v. Shutts, 472 U.S. at 812.

Some courts, including the United States Court of Appeals for the Federal Circuit and the United States District Court for the Middle District of Alabama, have held that personal jurisdiction over plaintiffs is never an issue, because, as the initiating party of a litigation, plaintiffs do not risk being brought into court without consent and are not at risk of a default judgment against them. See In re Genentech, Inc., 566 F.3d 1338 (Fed. Cir. 2009); Murray v. Scott, 176 F. Supp. 2d 1249 (M.D. Ala. 2001)(Thompson, J.). The Honorable Myron H. Thompson, United States District Judge for the Middle District of Alabama has explained:

> The minimum-contacts concerns inhere when a party is hailed into court without its consent upon pain of a default judgment. These concerns are not present when a plaintiff is forced to litigate his case in another forum. Barring a counterclaim, plaintiff will not have judgment entered against him in the new forum; even with a counterclaim, plaintiff chose to initiate litigation enabling the counterclaim. In no sense is plaintiff unilaterally being hailed into court to defend. Indeed, plaintiff's original choice of forum is preserved in at least one way: the law of the transferor forum will govern in the litigation rather than the law of the new forum. Therefore, the International Shoe [v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310 (1945)] minimum-

contacts analysis is not necessary. The requirement that a litigant have minimum contacts with the forum simply does not exist for an ordinary plaintiff.

Murray v. Scott, 176 F. Supp. 2d 1249 (M.D. Ala. 2001)(Thompson, J.). Accord Scott Dodson, Plaintiff Personal Jurisdiction and Venue Transfer, 117 Mich. L. Rev. 1463, 1467-68 (2019)(same). "In other words, because personal jurisdiction protects involuntary parties subject to the coercive power of a court, only defendants are entitled to the protections of personal jurisdiction." Dodson, supra, 117 Mich. L. Rev. at 1468. The Federal Circuit, similarly, has held that 28 U.S.C. § 1404(a) does not require the transferee court to have personal jurisdiction over plaintiffs. In re Genentech, Inc., 566 F.3d 1338, 1346 (Fed. Cir. 2009). See Dodson, supra, 117 Mich. L. Rev. at 1473 ("The court engaged in no other analysis of the issue. . . . [It reasons] that the lack of statutory *restriction* manifests authorization of nationwide personal jurisdiction." (emphasis in original)). The Honorable Richard Linn, United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, states that "[t]here is no requirement under § 1404(a) that a transferee court have jurisdiction over the plaintiff or that there be sufficient minimum contacts with the plaintiff; there is only a requirement that the transferee court have jurisdiction over the defendants in the transferred complaint." In re Genentech, Inc., 566 F.3d at 1346 (citing Hoffman v. Blaski, 363 U.S. 335, 343-44 (1960)). Under these approaches, therefore, the Court would conclude that it has personal jurisdiction over the Plaintiffs, because personal jurisdiction considerations apply only to defendants. The Court, nevertheless, believes a more thorough analysis of this issue is appropriate.

The Court does not agree with these approaches because they do not deal adequately with the command of the Fifth Amendment that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985), the Supreme Court held that the Fourteenth Amendment's due process

protections apply to "persons" and not merely to "defendants."[24]  472 U.S. at 807.  This language

makes perfunctory dismissal of the Plaintiffs' personal jurisdiction argument inappropriate; the

Court, therefore, will consider the issue in more depth.  As Professor Scott Dodson, Geoffrey C.

Hazard Jr. Distinguished Professor of Law and Associate Dean of Research at the University of

California Hastings College of Law, stated recently:

> The right path forward is for courts and commentators to confront [personal jurisdiction over plaintiffs in venue transfer cases] with the seriousness and consideration that it deserves.  Personal jurisdiction over the plaintiff applies and presents some protection when the case is transferred to a state in which the plaintiff otherwise is neither subject to nor has consented to personal jurisdiction.  Whether and how personal jurisdiction applies depends upon considerations other than blunt exemptions, statutory authority, and consent.

Dodson, supra, 117 Mich. L. Rev. at 1478-79.  The Court agrees with this analysis, because the

Fifth Amendment protects "persons," U.S. Const. Amend. V, a plaintiff in a suit is "entitled to

some protection from the jurisdiction of a forum State which seeks to adjudicate their claims."[25]

---

[24] The Court notes the difference between the Supreme Court's opinion in Phillips Petroleum Co. v. Shutts and this action -- the application of the Fourteenth rather than the Fifth Amendment.  See 472 U.S. at 807.  The Court concludes, however, that the Supreme Court's analysis as applied to the Kansas State court's exercise of jurisdiction over absent class plaintiffs and a federal court's exercise is the same; in both cases, the issue is whether the Fifth or the Fourteenth Amendment's due process protections apply to "persons."  U.S. Const. amends. V, XIV.

[25] The Court notes that Bristol-Myers Squibb is not on point regarding the Plaintiffs' claim that the Court lacks personal jurisdiction over this action.  Magellan HRSC, having sought the original transfer to the District of New Mexico, was amenable to jurisdiction in the Southern District of California, accepts the District of New Mexico's jurisdiction, and does not contest the Court's exercise of personal jurisdiction.  See SDC Order at 2.  The Supreme Court in Bristol-Myers Squibb states:

> Holding that there had been no due process violation, the Court explained that the authority of a State to entertain the claims of nonresident class members is entirely different from its authority to exercise jurisdiction over an out-of-state defendant.  Phillips Petroleum Co. v. Shutts, 472 U.S. at 808-812.  Since Shutts concerned the due process rights of *plaintiffs*, it has no bearing on the question presented here.

Phillips Petroleum Co. v. Shutts, 472 U.S. at 811.

The Supreme Court in Insurance Corporation of Ireland states: "A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court." 465 U.S. at 703. Concerning the Class Representatives in this action, the Court concludes that implied consent to a transferee venue's exercise of personal jurisdiction exists where the plaintiffs file an action that: (i) rests on a similar issue and similar facts as a case currently pending in another district; and (ii) creates a high likelihood of transfer to the district hearing the first-filed action to increase judicial efficiency.[26] See Dodson, supra, 117 Mich. L. Rev. at 1480-81 ("Although filing the case cannot supply blanket consent to personal jurisdiction anywhere the case ends up, it may manifest consent beyond the state where the case was filed."). The Plaintiffs filed this action in June, 2019, and the Court agrees with Judge Bashant's conclusion that this action's issues and facts are similar to Deakin, which was filed in the District of New Mexico in July, 2017. See SDC Order at 2-8. The Court also concludes that a high likelihood of transfer to the District of New Mexico existed in this action, because the first-to-file rule applied given that Deakin was, and remains, ongoing at the time this action was filed. See SDC Order at

Bristol-Myers Squibb, 137 S. Ct. at 1783 (emphasis in original). The Court concludes that the Plaintiffs are the only party in this action challenging the Court's exercise of personal jurisdiction following their withdrawal from Deakin, and therefore, the Court concludes that Phillips Petroleum Co. v. Shutts is applicable. See Reply at 5; Response at 1-5.

[26]This test mirrors the values that underlie personal jurisdiction protections for defendants -- namely, "treating defendants fairly and protecting 'interstate federalism.'" Ford Motor Co., 141 S. Ct. at 1025 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 293 (1980)). As for treating defendants fairly, the Supreme Court in Ford Motor Co. states that "[p]recisely because th[e] exercise of jurisdiction is so reasonable, it is also predictable." 141 S. Ct. at 1030. The Court analogizes this predictability of litigation for defendants to the likelihood of transfer because of the first-to-file rule that Professor Dodson proposes. See Dodson, supra, 117 Mich. L. Rev. at 1480-81.

3. The Court therefore concludes that the Class Representatives consented impliedly to the District of New Mexico's exercise of personal jurisdiction. See Ins. Corp. of Ireland, 456 U.S. at 704; Dodson, supra, 117 Mich. L. Rev. at 1480-81. Similarly, the Court concludes that the Class Representatives consented explicitly to the District of New Mexico's exercise of personal jurisdiction by opting-in affirmatively to Deakin.

Beyond concerns of personal jurisdiction regarding the Class Representatives who withdrew from Deakin, the Court concludes that it may exercise personal jurisdiction over non-resident class Plaintiffs' claims by applying the Supreme Court's opinion in Phillips Petroleum Co. v. Shutts. The Supreme Court states:

> We hold that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant. . . . We reject petitioner's contention that the Due Process Clause of the Fourteenth Amendment requires that absent plaintiffs affirmatively "opt in" to the class, rather than be deemed members of the class if they do not "opt out." We think that such a contention is supported by little, if any precedent and that it ignores the differences between class-action plaintiffs, on the one hand, and defendants in nonclass civil suits on the other.

Phillips Petroleum Co. v. Shutts, 472 U.S. at 811-12. In Phillips Petroleum Co. v. Shutts, the defendant attempted to dismiss a number of pending claims against it by arguing that a Kansas State court lacked personal jurisdiction over absent class members. See 472 U.S. at 802. Such an argument differs notably from the defendant's argument in Bristol-Myers Squibb -- that the California State court lacked specific personal jurisdiction over it because there was no connection between the non-residents' specific claims and the forum State. See 137 S. Ct. at 1778. In this action, by contrast, Magellan HRSC has not contested, at any stage, a court's exercise of personal jurisdiction over it, and, therefore, Bristol-Myers Squibb is not applicable. Instead, the Plaintiffs' challenge relates to the Court's exercise of personal jurisdiction over the Plaintiffs -- both the Class

Representatives and other proposed class members.  See Reply at 5. The proposed California class of "care managers" and "senior care managers" who worked for Magellan HRSC during the proposed class period is open to all individuals similarly situated, and does not require affirmative opting-in.  Transfer Memo at 2.  The Supreme Court holds in Phillips Petroleum Co. v. Shutts: "[A] forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant."  Phillips Petroleum Co. v. Shutts, 472 U.S. at 811. Accordingly, the Court concludes that the Plaintiffs' challenges to the Court's exercise of personal jurisdiction regarding absent class-members lack a sound basis in the applicable law and relevant facts.

IT IS ORDERED that the Plaintiffs' Motion to Transfer Venue under 28 U.S.C. § 1404(a), to the Southern District of California, filed July 8, 2020 (Doc. 48), is denied.


_____
UNITED STATES DISTRICT JUDGE



*Counsel*:

Daniel Robert Shinoff
Artiano Shinoff
San Diego, California

-- and --

Sheldon A. Ostroff
Law Offices of Sheldon A. Ostroff
San Diego, California

-- and --

Abbey Marie Jahnke
Jackson Lewis, P.C.
San Diego, California

    *Attorneys for the Plaintiffs*

Mark D. Temple
Sabrina L. Shadi
Baker & Hostetler, LLP
Houston, Texas

-- and --

Randy S. Bartell
Montgomery & Andrews, PA
Santa Fe, New Mexico

    *Attorneys for the Defendant*